C. Scott Greene, California Bar No. 277445
*scott.greene@bclplaw.com*
Aileen M. Hunter, California Bar No. 253162
*aileen.hunter@bclplaw.com*
**BRYAN CAVE LEIGHTON PAISNER LLP**
1920 Main Street, Suite 1000
Irvine, California 92614-7276
Telephone:   (949) 223-7000
Facsimile:   (949) 223-7100

Attorneys for Plaintiff
NIFTY TECHNOLOGIES, INC.

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

BRYAN CAVE LEIGHTON PAISNER LLP
1920 MAIN STREET, SUITE 1000
IRVINE, CA 92614-7276

| | |
|---|---|
| NIFTY TECHNOLOGIES, INC., a New York corporation,<br><br>Plaintiff,<br><br>v.<br><br>MANGO TECHNOLOGIES, INC., a Delaware corporation, d/b/a CLICKUP<br><br>Defendant. | Case No. **'24CV0194 JLS  AHG**<br><br>**COMPLAINT** |

Plaintiff Nifty Technologies, Inc. ("Nifty") complains and alleges as follows:

## PARTIES

1. Nifty is a New York Corporation doing business in the County of Nassau, New York, with its principal place of business in Levittown, New York.

2. Defendant Mango Technologies, Inc. d/b/a ClickUp ("ClickUp"), is a Delaware Corporation doing business in the County of San Diego, California, with its principal place of business in San Diego, California.

## JURISDICTION AND VENUE

3. This Court also has jurisdiction over this action under 28 U.S.C. § 1331 (federal question jurisdiction) because one of Plaintiff's claims arises under the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836(b).

4. This Court also has jurisdiction over this action under 28 U.S.C. § 1332(a) (diversity jurisdiction).

5. The parties in this case are diverse. ClickUp's headquarters are in California, and it is incorporated in Delaware. Thus, ClickUp is domiciled in California and Delaware. Nifty is both headquartered and incorporated in New York. Thus, Nifty is domiciled in New York. The amount in controversy is greater than $75,000.

6. This Court has supplemental jurisdiction over Plaintiff's state law claims because they "are so related to the [federal] claims… that they form part of the same case or controversy…" 28 U.S.C. §1367.

7. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this district.

8. Venue is also proper in this district pursuant to 28 U.S.C. § 1391(b)(1) because ClickUp resides in this district.

9. Venue is also proper under the terms of the Non-disclosure Agreement ("NDA") (attached herein as Exhibit A). ClickUp's principal place of business is

BRYAN CAVE LEIGHTON PAISNER LLP
1920 MAIN STREET, SUITE 1000
IRVINE, CA 92614-7276

1

BRYAN CAVE LEIGHTON PAISNER LLP
1920 MAIN STREET, SUITE 1000
IRVINE, CA 92614-7276

San Diego County. Under the language of the NDA, "[a]ny disputes under [the] Agreement may be brought in the state courts and the Federal courts for the county in which [ClickUp's] principal place of business is located, and the parties hereby consent to the personal jurisdiction and exclusive venue of these courts."

## FACTS COMMON TO EACH CLAIM

### Background

### Nifty

10. In the mid-2010s, the project management industry was an immature and disjointed market that was primed for growth.

11. The purpose of project management software is to facilitate and optimize the planning, execution, monitoring and successful completion of projects. During the mid-2010s, project management tools primarily provided features such as task assignments, due dates, and project timelines to keep track of their projects.

12. Shiv Kapoor ("Kapoor"), CEO of Nifty, saw the opportunity to create an innovative product that would allow companies to integrate their project management needs into a single platform.

13. At that time, there was a need in the project management market for software that was able to provide a single platform that could house all of the needs of a business team, including features like chat, task boards and document collaboration. The project management apps that did exist were focused on one or two functionalities, such as task management or project timelines. Without a single platform, users experienced data fragmentation and inefficient workflow. Kapoor's vision was to build a revolutionary single platform product.

14. The need for users to deploy separate applications ("apps") for each facet of a project inspired Kapoor to create Nifty. Nifty created a cutting-edge, all-in-one collaboration software that unites the functionality of project management apps with other experiences such as chat, document collaboration, file storage and other customer needs.

2

15.    In 2016, to realize his goal of creating the best project management product on the market, Kapoor built a team. Kapoor brought aboard Sky Calibey ("Calibey") as Head of Solutions, Nikola Boychev ("Boychev") as Nifty's first developer and Jeff Kagan ("Kagan") as Nifty's Head of Business Development.

16.    Excited at the impact of what they were building, the Nifty team planned to launch their beta product on Product Hunt, a popular online platform where companies announce the launch of a new business, a new product or product updates. It is an interactive platform where users can "upvote" and leave comments if they like a product. It is monitored regularly by product managers in the technology industry and venture capitalists.

17.     Nifty launched its software on Product Hunt on October 11, 2017, and was met almost immediately with enthusiasm from the market. Its launch went "viral" and received substantially more upvotes – 1,033 -- than is typical for new products. Nifty also received interest from venture capital firms.

**Launch of ClickUp and Evans' Nifty Account.**

18.    On January 27, 2017, a press release from Mango Technologies and its founder and CEO, Brian Tyler "Zeb" Evans ("Evans"), announced that the company was entering the project management market with the launch of ClickUp. Its stated goal was "to dominate the market."

19.    Unlike Nifty's comprehensive all-in-one approach, ClickUp launched software primarily focused on enabling project management teams to simply track tasks. ClickUp first appeared on Product Hunt on June 21, 2017, and received only 29 upvotes.

20.    On or about March 2019, Evans secretly signed up as a Nifty customer under a false name, "Tyler," using the email "fastfollowerz@gmail.com." Nifty did not discover this ruse until late 2020, when, in news articles, Evans noted that "fastfollowerz" was one of his first business ventures and revealed that frequently in ClickUp sales calls he used the fake name "Tyler."

BRYAN CAVE LEIGHTON PAISNER LLP
1920 MAIN STREET, SUITE 1000
IRVINE, CA 92614-7276

3

BRYAN CAVE LEIGHTON PAISNER LLP
1920 MAIN STREET, SUITE 1000
IRVINE, CA  92614-7276

21. After discovering Evans' deception, Nifty decided not to block the account at that time so it could monitor his usage.

22. By the fall of 2021, ClickUp had been struggling to scale its current product, as it was receiving complaints from users about reliability but finding it difficult to resolve those concerns. For example, on ClickUp's Reddit page, which ClickUp moderated, there were several user posts discussing ClickUp's lack of dependable infrastructure necessary to support its product.

23. ClickUp was also having issues building "microservices" that would enable it to scale its platform reliably as well as to integrate a live chat function. There are two common architectural designs for the back end or server-side of a web application: monolith-based and microservice-based. A monolith runs the entire application from one server. This is often an efficient or desirable method for a new application or one that is run for a single purpose. However, a monolith can severely limit growth, otherwise known as scalability. In contrast, a microservice-based architecture allows an application to be broken into a number of modules run on several different servers, which permits portions of the application to be updated or grown without affecting other parts of the application. By the fall of 2021, ClickUp had been struggling to build its own microservice structure and thus was still largely running on a monolith structure. In contrast, Nifty had created its own microservice architecture, which provided several benefits, including the ability to reliably scale its own product.

24. Further, Nifty had created a way to synchronize updates between its users and Nifty's mobile apps without requiring a user to be online to receive updates. This feature allowed users to receive all of the updates that happened during a period of device inactivity, as soon as their device became active again. ClickUp did not have this functionality.

**Initial Approach by ClickUp and Letter of Intent.**

25. In the early summer of 2021, ClickUp's Head of Business, Tommy

4

Wang ("Wang"), requested a demonstration of the Nifty software through a link on Nifty's website. The email address used by Wang was his personal email, not his ClickUp address.

26. The demonstration was scheduled for June 21, 2021. Calibey was prepared to handle the demonstration for Nifty, as he did for all customers. To Calibey's surprise, Wang disclosed that he was ClickUp's Head of Business. Wang began asking Calibey a series of questions about Nifty and the market. When Wang started to ask about Nifty's business culture, Calibey stopped answering his questions. Wang then revealed that there was interest at ClickUp in combining with Nifty and asked Calibey to relay that message to Kapoor.

27. On July 6, 2021, having not heard from Kapoor, Wang sent a message to Nifty co-founder Kagan reiterating ClickUp's interest in Nifty. Kagan passed this message along to Kapoor. Kapoor decided to listen to ClickUp's proposal.

28. On July 22, 2021, Kapoor and Evans had an introductory call where Evans confirmed that ClickUp was interested in some form of business combination with Nifty. Evans told Kapoor that the two men shared the same "vision" and expressed his confidence that together they could "upend the market."

29. In the subsequent weeks, ClickUp's leadership pursued Kapoor and Nifty with predictions of how Nifty's innovative product would fit well with ClickUp's marketing expertise and how the combined enterprise would become the dominant force in the industry. Initially, Evans and Wang suggested that the two companies would maintain separate product offerings while operating as ongoing operating entities under the Mango corporate umbrella. The Nifty co-founders were impressed with these overtures and decided to pursue a deal. On September 7, 2021, ClickUp and Nifty entered into a non-disclosure agreement ("NDA") so that confidential material could be shared between the companies. A true and correct copy of the NDA is attached hereto as Exhibit "A."

30. As the discussions progressed, ClickUp changed the structure of the

5

COMPLAINT

BRYAN CAVE LEIGHTON PAISNER LLP
1920 MAIN STREET, SUITE 1000
IRVINE, CA 92614-7276

deal to an acquisition by ClickUp. On September 20, 2021, ClickUp and Nifty entered into a Letter of Intent ("LOI") for ClickUp to acquire Nifty's assets for $3 million in cash plus $16 million in ClickUp stock paid out in accordance with each Nifty founder's equity. The LOI included an exclusivity clause that prevented Nifty from negotiating with any other company. A true and correct copy of the LOI is attached hereto as Exhibit "B."

31.     Evans and Wang expressed their desire to close the transaction as soon as possible (and said that they had already received board approval), but in the meantime pressed for access to Nifty confidential information as part of the "due diligence" process. Specifically, Wang urged Nifty to set up – as soon as possible -- a data room for Nifty to share its most sensitive financial and marketing information. Within days of executing the LOI, Nifty opened the data room to ClickUp. Included among the documents available to ClickUp were Nifty's historical and current financial statements, annual revenue rate by customer, monthly revenue rate by customer, sales registered by customer, historical trends of daily average users, historical trends of monthly average users, lists of paid customers, lists of free customers, customer conversion rates, an organization chart, lists of employees and valuations of Nifty.

### ClickUp Acquires Nifty's Trade Secrets

32.     During the due diligence process, ClickUp's newly hired Head of Engineering, Shailesh Kumar ("Kumar"), became actively involved. On September 29, 2021, Kumar sent Kapoor an agenda for a two-and-a-half-hour call that was pitched as a technical vetting of Nifty by going deep into its product philosophy, code and product architecture. Kumar stated that he intended to "understand [Nifty's] architecture, technologies used, open-source libraries that are used along with high level code walkthrough of code structure, code quality etc." He also insisted that Nifty show him how it released code, its automation gates, how it scaled the product and how it overcame challenges along the way.

6

BRYAN CAVE LEIGHTON PAISNER LLP
1920 MAIN STREET, SUITE 1000
IRVINE, CA  92614-7276

33. Kumar also requested a second day of meetings where he could have one-on-one interviews with Nifty's engineers to assess their "fit" within ClickUp.

34. The deep-dive technical call occurred on October 5, 2021. During the call, Nifty provided the information requested by Kumar. At the urging of Kumar, among other things, Nifty shared information about its document-tagging feature, its ability to synchronize updates for customers and the "microservices" architecture of its product – all very closely held trade secrets.

35. The deep dive call ended on a very positive note, with Kumar expressing his gratitude to the Nifty team for the information they shared with ClickUp. Despite the sensitive nature of the discussion, ClickUp assured Nifty repeatedly during and after the call that this information would be valuable to their future partnership. ClickUp continued to push for a quick closing of the deal.

36. In another call, ClickUp pressed Nifty for its conversion data – also a valuable trade secret -- which includes the rate that the company converts a free user to a paying customer. Nifty's conversion rate was over twice the industry average. In connection with this discussion, ClickUp examined Nifty's pricing page, which differed markedly from the pricing page ClickUp had been using since its launch. Nifty's pricing page was a major contributor to Nifty's impressive conversion rates.

37. Notwithstanding what they told Nifty, with the information gained from these calls, the ClickUp executives knew by then that they had the ability to take Nifty's trade secret information and implement it into ClickUp's own product *without* having to acquire Nifty or its employees. Through Nifty's description of its trial and error process in building the industry's pioneering product, ClickUp obtained the information to know what worked and, perhaps more importantly, what did not work, thus saving ClickUp untold time, money and risk.

38. On October 6, 2021, Kumar proceeded with the scheduled one-on-one interviews with Nifty's engineers, but they lasted only a few minutes. Inexplicably, he did not ask the engineers for their GitHub profiles. He did not ask them to submit

7

BRYAN CAVE LEIGHTON PAISNER LLP
1920 MAIN STREET, SUITE 1000
IRVINE, CA  92614-7276

sample projects or complete any coding tests. Instead, he asked questions having nothing to do with their engineering skills. Following these interviews, Kumar told Kapoor that the Nifty engineers were "quirky" and not good enough for ClickUp. This seemed bizarre to Kapoor, given the proven success of the product Nifty's engineers had built. Nonetheless, it appeared to Kapoor that the companies' discussions had come to an end. In hindsight, Kapoor and the other founders came to realize that Kumar's interviews were nothing but a sham.

39.    Kapoor turned to Evans for an explanation for the termination of discussions.  Evans told him that the decision was "an engineering decision." Evans reassured Kapoor, however, that he and Wang were "still trying to figure out a plan B."

40.    Shortly after ClickUp ended negotiations with Nifty and mere days after Nifty had shared its proprietary information with ClickUp, ClickUp announced publicly that it had secured $400 million in Series C funding.

### The Deal Falls Apart for Good

41.    On October 20th, 2021, Wang sent Kapoor an email outlining a second offer where employment contracts, including salary and ClickUp stock, would be offered to the Nifty team, along with a reduced cash offer for Nifty. Kapoor promptly declined, as the terms would not "justify shutting Nifty down" especially when Nifty was at the "most exciting phase" of its evolution.

42.    In November 2021, Wang sent Kapoor an email with an updated offer. Among other things, ClickUp wanted to hire Kapoor to lead ClickUp's team to create a ClickUp chat function.  According to Wang, chat was a "hugely challenging problem [for ClickUp] to solve" and ClickUp had "a lot of confidence" in Kapoor to fix the issue. Further, in stark contrast to Kumar's comments about Nifty's engineers as "quirky" and not a "fit" just a few weeks before, Wang told Kapoor that the deal was "anchor[ed] on" the "value of [Nifty's] people."

43.    Later that month, ClickUp sent a different offer to Nifty that was

8

COMPLAINT

focused only on hiring Kapoor and his co-founders. The offer, called an "acquihire," was worth substantially less to each member of Nifty's team than the original offer to acquire Nifty's assets.

44.    At Evans' insistence, on December 12, 2021, Kapoor met face-to-face with Evans in New York City so that Evans could personally assure Kapoor that ClickUp remained keenly interested in acquiring Nifty's team and that he was ready to get a deal done as soon as possible. The December 12th meeting was Kapoor's first face-to-face meeting with Evans, which signaled to Kapoor that ClickUp was sincerely interested in closing a deal.

45.    On December 17, 2021, ClickUp had Nifty execute an extension of the negotiation exclusivity period through January 15, 2022. Shortly thereafter, Kapoor received another assurance from Evans that "we should be good" with closing a deal.

46.    Yet, on January 7, 2022, Kapoor received a written offer letter that left out many of the previously agreed terms, reduced Kapoor's salary and changed his vesting structure to a lower yearly percentage.  Kapoor was assured that this could be discussed further, and ClickUp kept Nifty in exclusive negotiations.

47.    On January 16, 2022, Evans called Kapoor purportedly to share a concern at ClickUp about two small lawsuits that had been brought against Nifty long before by disgruntled contractors. This seemed strange to Kapoor since none of the various structures of the deal floated by ClickUp had included ClickUp assuming Nifty's liabilities. Kapoor told Evans that those suits would be settled soon for nuisance value (and they were).

48.    Despite the prior assurances that ClickUp was anxious to close a deal as soon as possible, Nifty heard nothing further from Evans or Wang until January 26, 2022. At that point, Evans sent Kapoor an email stating that the deal with Nifty and its team was terminated due to market "conditions" and the "lawsuits." No further explanation was provided.

BRYAN CAVE LEIGHTON PAISNER LLP
1920 MAIN STREET, SUITE 1000
IRVINE, CA 92614-7276

9

49. Just two days later, on January 28, 2022, despite his supposed concern about the market and the litigation, Evans offered Kapoor another deal. This deal was to shutter Nifty and hire its founders, except with a significantly reduced cash payment. Kapoor insisted on terms that more aligned with the original offer. Evans then withdrew the proposal.

### The Theft Becomes Clear

50. Throughout the negotiations with ClickUp, Nifty continued to release updates to its product. Beginning after the "deep dive" call with Kumar, ClickUp began to release updates that seemed coincidentally to align with trade secrets and confidential and proprietary information Nifty had shared with ClickUp under the NDA. For example, Evans announced on November 12, 2021, by video, a "revolutionary" document-tagging feature that mirrored the equivalent feature of Nifty's product, which allowed tasks and documents to be tagged in the same categories. As another example, obviously motivated by what it learned about Nifty's conversion rate, ClickUp changed its pricing page -- for the first time since its launch in 2017 -- to a design that was remarkably similar to Nifty's page.

51. Nifty determined that Evans had logged into his Nifty account 228 times between 2019 and 2022. Reexamining his activity in light of the failed combination discussions, it was apparent to Nifty that Evans was never using his account for any proper purpose, but instead was using it to copy Nifty's platform as much as possible.

52. By early 2023, ClickUp's scheme became abundantly clear to Nifty. Kumar, the Head of Engineering, posted a blog that discussed his great success in reengineering ClickUp's product features to make ClickUp a market leader. Kumar stated that he was leading ClickUp's "efforts to rearchitect [its] infrastructure for reliability and performance." To highlight these efforts, Kumar pointed to ClickUp's transition to using "microservice architecture" from a monolith architecture – obviously influenced by trade secret and confidential and proprietary information

BRYAN CAVE LEIGHTON PAISNER LLP
1920 MAIN STREET, SUITE 1000
IRVINE, CA 92614-7276

10

ClickUp had learned from Nifty.

53. Adding insult to injury, Nifty learned in late 2023 that in November 2021, after the initial acquisition discussions had ended, ClickUp posted a review of Nifty's product on its website that contained false information about Nifty. For example, ClickUp claimed that Nifty's product did not "let you build your own automation." This was false, as Nifty's product had the ability for custom automation since early 2021. Further, ClickUp claimed that Nifty did not offer dashboards and that a "project management app without dashboards is like Leonardo DiCaprio without an Oscar." This was also false, as Nifty had long offered dashboards as a part of its product.

54. From 2022 on, Nifty has been hearing from customers the "street news" that *Nifty* that had been copying ClickUp's product, when the truth was the opposite. This market confusion has cost Nifty customers and significant revenue.

55. ClickUp was able to exploit Nifty's willingness to create a trusting working relationship ahead of a supposed combination. ClickUp stole Nifty's trade secrets without having to invest the time or money, or take the risk, to independently develop similar functionality. Meanwhile, ClickUp has benefited in revenue and cost savings on the back of Nifty's work.

56. Evans once told an interviewer that "everyone in this industry rips each other off." ClickUp certainly lives by this mantra, with Nifty as an unwitting victim.

## **FIRST CLAIM FOR VIOLATION OF 18 U.S.C. § 1836**
### **(Defend Trade Secrets Act)**

57. Nifty realleges and incorporates by this reference paragraphs 1-56 of this complaint.

58. Nifty owns confidential information not available to the public, including but not limited to, Nifty's customer conversion metrics, how Nifty was able to obtain its high conversion rates, the enabling structure and logic of its

11

BRYAN CAVE LEIGHTON PAISNER LLP
1920 MAIN STREET, SUITE 1000
IRVINE, CA 92614-7276

BRYAN CAVE LEIGHTON PAISNER LLP
1920 MAIN STREET, SUITE 1000
IRVINE, CA  92614-7276

microservice structure, its customer data (in both raw and structured form), information concerning its customers' identities, needs and preferences, and Nifty's logic and process for synchronization of updates for customers; as well as Nifty's methods and techniques for optimizing the functionality of its products, as developed for its own use and/or use by its customers (collectively, the "Confidential Trade Secret Information").

59.    The Confidential Trade Secret Information is and was a trade secret belonging to Nifty at all relevant times.

60.    The Confidential Trade Secret Information is not generally known or readily ascertainable, and it derives independent economic value from being secret and not known to others, thereby providing Nifty with a significant competitive advantage. It has been the subject of reasonable measures to maintain its secrecy, including through confidentiality agreements and limited access within the company.

61.    The Confidential Trade Secret Information relates to services used in, or intended for use in, interstate commerce. Specifically, Nifty works with customers in multiple states and routinely services customers located across state lines.

62.    ClickUp misappropriated Confidential Trade Secret Information belonging to Nifty, without Nifty's consent or authorization by, among other things, acquiring such information by improper means and using it in violation of obligations of confidentiality.

63.    As a result of ClickUp's conduct, Nifty was harmed in an amount to be proven at trial. Further, ClickUp was unjustly enriched through its misappropriation.

64.    ClickUp's misappropriation was willful and malicious, entitling Nifty to punitive damages and attorneys' fees and costs.

65.    Nifty further seeks injunctive relief, to prevent ClickUp from further use of the Confidential Trade Secret Information in any manner.

COMPLAINT

## SECOND CLAIM FOR VIOLATION OF CAL. CIV. CODE § 3426 ET. SEQ.

### (California Uniform Trade Secrets Act)

66. Nifty realleges and incorporates by this reference paragraphs 1-65 of this complaint.

67. Nifty owns confidential information not available to the public, including but not limited to Nifty's customer conversion metrics, how Nifty was able to obtain its high conversion rates, the enabling structure and logic of its microservice structure, its customer data (in both raw and structured form), information concerning its customers' identities, needs and preferences, and Nifty's logic and process for synchronization of updates for customers; as well as Nifty's methods and techniques for optimizing the functionality of its products, as developed for its own use and/or use by its customers (collectively, the "Confidential Trade Secret Information").

68. The Confidential Trade Secret Information is and was a trade secret belonging to Nifty at all relevant times.

69. The Confidential Trade Secret Information is not generally known or readily ascertainable, and it derives independent economic value from being secret and not known to others, thereby providing Nifty with a significant competitive advantage. It has been the subject of reasonable measures to maintain its secrecy, including through confidentiality agreements and limited access within the company.

70. ClickUp misappropriated Confidential Trade Secret Information belonging to Nifty, without Nifty's consent or authorization by, among other things, acquiring such information by improper means and using it in violation of obligations of confidentiality.

71. As a result of ClickUp's conduct, Nifty was harmed in an amount to be proven at trial. Further, ClickUp was unjustly enriched through its misappropriation.

72. ClickUp's misappropriation was willful and malicious, entitling Nifty

13

BRYAN CAVE LEIGHTON PAISNER LLP
1920 MAIN STREET, SUITE 1000
IRVINE, CA 92614-7276

to punitive damages and attorneys' fees and costs.

73. In doing the acts alleged in this Complaint, ClickUp acted with oppression and/or malice as defined in Civil Code section 3294, therefore entitling Nifty to punitive damages.

74. Nifty further seeks injunctive relief, to prevent ClickUp from further use of the Confidential Trade Secret Information in any manner.

## THIRD CLAIM FOR VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE SECTION 17200 ET SEQ.

75. Nifty realleges and incorporates by this reference paragraphs 1-74 of this complaint.

76. ClickUp's conduct constitutes unlawful, unfair, and/or fraudulent business practices in violation of the California Business and Professions Code section 17200 *et seq.* ClickUp has engaged in unlawful, unfair, and/or fraudulent business practices by, among other things, the following acts: creating an account with a fake username to track and implement for itself the latest Nifty updates, locking Nifty into exclusivity arrangements with no intent to close a deal, taking advantage of Nifty's willingness to share information with ClickUp about its product under the guise of an asset purchase transaction, copying the look and feel of Nifty's product, continuously releasing updates of ClickUp's product that included copies of prior updates made by Nifty, and misrepresenting Nifty's product through false blog posts.

77. As a direct and proximate result of ClickUp's conduct, Nifty is entitled to restitution in an amount to be proven at trial and/or injunctive relief.

## FOURTH CLAIM FOR BREACH OF WRITTEN CONTRACT

78. Nifty realleges and incorporates by this reference paragraphs 1-77 of this complaint.

79. ClickUp and Nifty entered into the Non-Disclosure agreement ("NDA") on or about September 7, 2021. The NDA is an enforceable written

14

BRYAN CAVE LEIGHTON PAISNER LLP
1920 MAIN STREET, SUITE 1000
IRVINE, CA  92614-7276

contract, attached as Exhibit A.

80. Nifty has performed all of its obligations under the NDA.

81. Notwithstanding Nifty's performance of its duties and obligations under the NDA, ClickUp has breached the NDA by, among other things: improperly using information stored within the data room pertaining to Nifty's marketing data; improperly using information stored within the data room pertaining to Nifty's code; improperly using confidential information learned during discussions with Nifty, including the October 5, 2021 call, where ClickUp learned proprietary information regarding Nifty's synchronization update process, its microservices structure, and its document tags feature.

82. Specifically, ClickUp is in breach of section 7 of the NDA which states "[n]either Receiving Party will make, have made, use or sell for any purpose any product or other item using, incorporating or derived from any Confidential Information of the Disclosing Party."

83. Further, ClickUp is in breach section 18 of the NDA which states "[e]ach Party agrees that the software programs of the other Party contain valuable confidential information and each Party agrees that it will not modify, reverse engineer, decompile, create other works from, or disassemble any software programs contained in the Confidential Information of the other Party without the prior written consent of the other Party."

84. ClickUp is in breach of section 8 of the NDA which states that "[t]he Receiving Party will not reproduce the Confidential Information of the Disclosing Party in any form except as required to accomplish the intent of this Agreement."

85. ClickUp is in breach of the NDA with its use of Nifty's Confidential Information including its use of Nifty's microservice structure, conversion data, synchronization update process, and document tags feature.

86. ClickUp's breaches of the NDA have directly and proximately caused damage to Nifty. As a result of the ClickUp's wrongful conduct, Nifty has been

15

damaged in an amount to be proven at trial.

## FIFTH CLAIM FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

87.    Nifty realleges and incorporates herein by this reference paragraphs 1-86 of this complaint.

88.    On or about September 7, 2021, Nifty and ClickUp entered into the NDA, which had an effective date of September 7, 2021.

89.    Nifty has performed all conditions and obligations on its part under the NDA.

90.    All conditions required for ClickUp's performance under the NDA have occurred.

91.    ClickUp has unfairly interfered with Nifty's right to receive the protections of the NDA by, among other things;

   a.    Taking advantage of Nifty's willingness to share information with ClickUp about its product under the guise of an asset purchase transaction; and

   b.    Demanding that Nifty share its Confidential Trade Secret Information to maintain a good relationship for a deal that ClickUp did not intend to close; and

   c.    Implementing Nifty's Confidential Trade Secret Information into its own product to increase its own profitability while decreasing its offers to Nifty.

92.    By engaging in the conduct set forth in Paragraph 91, ClickUp did not act fairly and in good faith.

93.    Nifty has been harmed by ClickUp's conduct in an amount to be proved at trial.

## PRAYER

Nifty prays for judgment against ClickUp as follows:

94.    For an Order enjoining ClickUp from:

   a.    continuing to use Confidential Trade Secret Information

16

BRYAN CAVE LEIGHTON PAISNER LLP
1920 MAIN STREET, SUITE 1000
IRVINE, CA 92614-7276

belonging to Nifty; and

b.    soliciting and conspiring to solicit any customers or funding using Confidential Trade Secret Information belonging to Nifty;

95.    For restitution of all amounts Defendants improperly obtained;

96.    For damages in an amount to be proven at trial, including but not limited to pre- and post-judgment interest;

97.    For punitive damages as a result of Defendant's malicious and/or oppressive conduct;

98.    For attorneys' fees and costs, where allowed; and

99.    For such relief as the Court may deem just and proper.

Dated: January 30, 2024

**BRYAN CAVE LEIGHTON PAISNER LLP**

By: */s/ Aileen M. Hunter*
C. Scott Greene
Aileen M. Hunter
Attorneys for Plaintiff
NIFTY TECHNOLOGIES, INC.

BRYAN CAVE LEIGHTON PAISNER LLP
1920 MAIN STREET, SUITE 1000
IRVINE, CA 92614-7276

17