1
2
3
4
5
6
7
8          UNITED STATES DISTRICT COURT
9         SOUTHERN DISTRICT OF CALIFORNIA
10

| | |
|---|---|
| NIFTY TECHNOLOGIES, INC., a New York corporation,<br><br>                                    Plaintiff,<br><br>v.<br><br>MANGO TECHNOLOGIES, INC., a Delaware corporation, d/b/a CLICKUP,<br><br>                                    Defendant. | Case No.:  24-CV-194 JLS (AHG)<br><br>**ORDER (1) GRANTING IN PART AND DENYING IN PART DEFENDANT'S REQUEST FOR JUDICIAL NOTICE AND (2) GRANTING DEFENDANT'S MOTION TO DISMISS**<br><br>(ECF No. 21) |

        Presently before the Court is Defendant Mango Technologies, Inc. d/b/a ClickUp's ("Defendant" or "ClickUp") Motion to Dismiss ("Mot.," ECF No. 21), supporting Memorandum of Points and Authorities ("Mem.," ECF. No. 21-1), and Request for Judicial Notice ("RJN," ECF No. 21-2) in support thereof.[1]  Plaintiff Nifty Technologies, Inc. ("Plaintiff" or "Nifty") filed an Opposition to the Motion ("Opp'n," ECF No. 22) and an Opposition to the Request for Judicial Notice ("RJN Opp'n," ECF No. 22-1), to which

_____

[1] All citations refer to the blue page numbers affixed to the top right corner of each page in the Court's CM/ECF system.

Defendant filed a Reply to Plaintiff's Opposition to the Motion ("Reply," ECF No. 24) and Reply to Plaintiff's Opposition to the Request for Judicial Notice ("RJN Reply," ECF No. 24-1).  Having carefully reviewed Plaintiff's Complaint ("Compl.," ECF No. 1), the Parties' arguments, and the law, the Court **GRANTS IN PART AND DENIES IN PART** Defendant's RJN and **GRANTS** Defendant's Motion.

## BACKGROUND

This case involves two competitors in the project management software industry—Plaintiff Nifty and Defendant ClickUp.  Observing the absence of integrated project management apps on the market in the mid-2010s, Nifty CEO Shiv Kapoor developed a self-described "cutting-edge, all-in-one collaboration software that unites the functionality of project management apps with other experiences such as chat, document collaboration, file storage and other customer needs."  *Id.* ¶¶ 11–14.  Nifty launched its product on October 11, 2017, and the release was received with, in Nifty's estimation, glowing reviews.  *Id.* ¶ 17.

Not long before Nifty entered the market, ClickUp launched a product of its own on June 21, 2017.  *Id.* ¶ 19.  However, according to Nifty, ClickUp quickly encountered an obstacle—scalability.  *Id.* ¶ 22.  Nifty blames ClickUp's struggle to effectively scale, at least in part, on ClickUp's reliance on a monolith-based architecture.  *Id.* ¶ 23.  As Nifty describes it,

> There are two common architectural designs for the back end or server-side of a web application: monolith-based and microservice-based.  A monolith runs the entire application from one server.  This is often an efficient or desirable method for a new application or one that is run for a single purpose.  However, a monolith can severely limit growth, otherwise known as scalability.  In contrast, a microservice-based architecture allows an application to be broken into a number of modules run on several different servers, which permits portions of the

> application to be updated or grown without affecting other parts
> of the application.

*Id.*  In contrast to Nifty—which had created its own microservice-based architecture that could reliably scale—ClickUp was stuck with a monolith-based architecture that lacked the "dependable infrastructure necessary to support its product."  *Id.* ¶ 22.

Nifty alleges that its reliable architecture, coupled with several other innovative features such as the ability "to synchronize updates between [] users and Nifty's mobile apps without requiring a user to be online to receive updates," inspired ClickUp to seek a partnership.  *Id.* ¶ 24–25.  The initial approach took place in June 2021 when ClickUp's Head of Business, Tommy Wang, requested a software demonstration.  *Id.* ¶ 25.  During the demonstration, Wang "revealed that there was interest at ClickUp in combining with Nifty," and he requested a message be sent to Kapoor expressing such interest.  *Id.* ¶ 26.

This communication sparked an extended negotiation between the two companies. In July 2021, Kapoor shared an introductory call with ClickUp CEO, Brian Tyler "Zeb" Evans, which resulted in the execution of a non-disclosure agreement ("NDA") on September 7, 2021, so that ClickUp could examine Nifty's confidential information while analyzing the merits of a merger and/or acquisition.  *Id.* ¶ 29.  The two companies also executed a Letter of Intent ("LOI") on September 20, 2021, whereby a tentative offer was tendered for ClickUp to acquire Nifty.  *Id.* ¶ 30.  Soon after executing the LOI, the parties commenced the due diligence process with Nifty opening a data room where it shared "its most sensitive financial and marketing information," including "Nifty's historical and current financial statements, annual revenue rate by customer, monthly revenue rate by customer," and more.  *Id.* ¶ 31.  Also among the actions taken during the due diligence process was a two-and-a-half-hour deep-dive technical call on October 5, 2021, during which "Nifty shared information about its document-tagging feature, its ability to synchronize updates for customers and the 'microservices' architecture of its product."  *Id.* ¶ 34.

Despite the "very positive note" on which the deep-dive technical call ended, the

companies were unable to reach a deal. *Id.* ¶ 39. Discussions surrounding the LOI ended, with ClickUp justifying its withdrawal as "an engineering decision." *Id.* Nevertheless, ClickUp extended several alternative offers of varying palatability to Nifty over the next few months,[2] but Kapoor rejected the offers because, in his mind, they amounted to effectively "shutting Nifty down," a decision he was unwilling to make. *Id.* ¶¶ 41–49.

All the while, Nifty claims that "ClickUp began to release updates that seemed coincidentally to align with trade secrets and confidential and proprietary information Nifty had shared with ClickUp under the NDA." *Id.* ¶ 50. These updates included a "document-tagging feature that mirrored the equivalent feature of Nifty's product" and a change to ClickUp's pricing page "that was remarkably similar to Nifty's page." *Id.*

Nifty additionally alleges that ClickUp engaged in various other unfair business practices that took place outside formalized business negotiations. Nifty claims that Evans, ClickUp's CEO, had been surreptitiously using a Nifty account under the pseudonym "fastfollowerz" beginning in March 2019. *Id.* ¶ 20. Nifty determined that Evans had logged into his Nifty account 228 times between 2019 and 2022 in an effort "to copy Nifty's platform as much as possible." *Id.* ¶ 51. Nifty originally discovered Evans's tactics in late 2020 but "decided not to block the account at that time so it could monitor his usage." *Id.* ¶ 21. Nifty also discovered a November 2021 blog post by ClickUp that allegedly contained false information in a review of Nifty's product. *Id.* ¶ 53; Ex. B, ECF No. 21-5.

Nifty brought this action on January 30, 2024, alleging the misappropriation of trade secrets under the federal Defend Trade Secrets Act and the California Uniform Trade Secrets Act, the violation of Section 17200 of California's Business and Professions Code, breach of contract, and breach of the implied covenant of good faith and fair dealing. *See id.* ClickUp filed the instant Motion and RJN on April 22, 2024, seeking dismissal of all

---

[2] The Complaint describes these alternative offers in more detail, but the Court does not find the details germane to what follows in this order. *See* Compl. ¶¶ 41–49.

but the breach of contract claim.  *See* Mot.

**REQUEST FOR JUDICIAL NOTICE**

Defendant requests the Court incorporate by reference and/or take judicial notice of the following documents: (1) a blog post published on ClickUp's website on February 28, 2023, entitled "How ClickUp 3.0 Will Change Your Day-to-Day Experience" ("Ex. A," ECF No. 21-4); (2) a blog post published on ClickUp's website on November 11, 2021, entitled "Nifty Project Management Review (Key Features, Pros, Limitations)" ("Ex. B," ECF No. 21-5); (3) ClickUp's "plan and pricing comparison page" from September 3, 2020 ("Ex. C," ECF No. 21-6); and (4) Nifty's pricing page from September 25, 2021 ("Ex. D," ECF No. 21-7).  *See generally* RJN.

## I.     Legal Standard

"Generally, district courts may not consider material outside the pleadings when assessing the sufficiency of a complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure."  *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018) (citing *Lee v. City of L.A.*, 250 F.3d 668, 688 (9th Cir. 2001)).  "There are two exceptions to this rule: the incorporation-by-reference doctrine, and judicial notice under Federal Rule of Evidence 201."  *Id.*  Both exceptions "permit district courts to consider materials outside a complaint . . . ."  *Id.*

Under the incorporation-by-reference doctrine, a court may "take into account documents 'whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleading.'"  *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) (alteration in original) (quoting *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999)).  A defendant may seek to incorporate a document into the complaint in two ways.  First, "if the plaintiff refers extensively to the document," it may be incorporated by reference.  *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).  However, "[f]or 'extensively' to mean anything under *Ritchie*, it should, ordinarily at least, mean more than once."  *Khoja*, 899 F.3d at 1003 (citing *Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010)).  Second, a

5

document may be incorporated by reference if "the document forms the basis of the plaintiff's claim." *Ritchie*, 342 F.3d at 908.  A document forms the basis of the plaintiff's claim when "the claim necessarily depend[s]" on the document.  *Khoja*, 899 F.3d at 1002 (quoting *Knievel*, 393 F.3d at 1076).  "However, if the document merely creates a defense to the well-pled allegations in the complaint, then that document did not necessarily form the basis of the complaint." *Id*.

"The defendant may offer such a document, and the district court may treat such a document as part of the complaint, and thus may assume that its contents are true for purposes of a motion to dismiss under Rule 12(b)(6)." *Ritchie*, 342 F.3d at 908.  However, "[t]he incorporation-by-reference doctrine does not override the fundamental rule that courts must interpret the allegations and factual disputes in favor of the plaintiff at the pleading stage." *Khoja*, 899 F.3d at 1014.

"[T]he court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).  "Accordingly, '[a] court may take judicial notice of matters of public record . . . .'" *Khoja*, 899 F.3d at 999 (quoting *Lee*, 250 F.3d at 689).  "But a court cannot take judicial notice of disputed facts contained in such public records." *Id*. (citing *Lee*, 250 F.3d at 689).

## II.   Analysis

### A.   Exhibit A—February 28, 2023 Blog Post

Defendant first argues that the Complaint incorporates Exhibit A by reference because the February 28, 2023 blog post "is crucial to [Plaintiff's] attempt to plead that ClickUp misappropriated one of Plaintiff's trade secrets: its 'microservices architecture.'" RJN at 5.  The Court disagrees.  The Court does not find—and Defendant does not argue—that Plaintiff referred extensively to the 2023 blog post.  *See generally* RJN.  In fact, Defendant identifies only a single reference to the 2023 blog post in Plaintiff's Complaint.  Compl. ¶ 52.  As the court explained in *Khoja*, a document generally must be referenced

more than once to be considered extensive.  899 F.3d at 1003; *see*, *e.g.*, *AliveCor, Inc. v. Apple Inc.*, 592 F. Supp. 3d 904, 912 (N.D. Cal. 2022) (finding exhibits referenced once or twice not extensive enough to warrant incorporation by reference).  And, here, the cursory mention of the 2023 blog post in the Complaint is not the sort of "relatively lengthy" reference required under *Khoja*.  *Khoja*, 899 F.3d at 1003.

Moreover, while Plaintiff's reference to the 2023 blog post may *support* its claim that Defendant misappropriated Plaintiff's trade secret, the blog post is not the *basis* of that claim.  In *Khoja*, the court held that a web article formed the basis of the plaintiff's claim because it "triggered the alleged scheme, [thus] form[ing] the basis of the scheme" and that another web article formed the basis of the plaintiff's claim when it contained the alleged misrepresentations that the defendant was accused of making.  *Id.* at 1003–05.  Here, Plaintiff's misappropriation claim does not arise out of the 2023 blog post because Plaintiff's claim exists independently of it.  Though Exhibit A may contain evidence that supports Plaintiff's claim, it does not form the basis of the claim.  Therefore, Exhibit A is not incorporated by reference.

Defendant next contends, in the alternative, that Exhibit A is appropriate for judicial notice because it is publicly available, and its accuracy can be readily determined.  RJN at 6.  Plaintiff does not contest Exhibit A's authenticity, only Defendant's characterization of the statements made therein.  RJN Opp'n at 4.  Accordingly, the Court **GRANTS** Defendant's request for judicial notice of Exhibit A's existence but does not take judicial notice of any facts within.  *See Signature Mgmt. Team, LLC v. Automattic, Inc.*, 941 F. Supp. 2d 1145, 1147–48 (N.D. Cal. 2013).

### B.   Exhibit B—November 11, 2021 Blog Post

Similarly, according to Defendant, Plaintiff's Complaint incorporates by reference Exhibit B because the Complaint references the blog post "as crucial support for Plaintiff's Third Claim for violation of California's Unfair Competition Law ('UCL')."  RJN at 5.  Plaintiff does not dispute that assertion, but instead takes issue with Defendant's framing of the blog post's contents.

The Court agrees with Defendant.  Plaintiff references the 2021 blog post to establish that Defendant "engaged in unlawful, unfair, and/or fraudulent business practices by . . . misrepresenting Nifty's product through false blog posts."  Compl. ¶ 76.  Unlike Exhibit A, which merely plays a supporting role in Plaintiff's claims, Exhibit B is the lead actor.  *See*, *e.g.*, *Khoja*, 899 F.3d at 1004–05.  Therefore, Plaintiff's Complaint necessarily relies on—and thereby incorporates by reference—the November 11, 2021 blog post.  The Court thus **GRANTS** Defendant's request to consider Exhibit B incorporated by reference.  That said, Defendant should be careful what it asks for as the incorporation-by-reference doctrine mandates the Court to "interpret the allegations and factual disputes in favor of [Plaintiff] at the pleading stage."  *Id.* at 1014.

### C.    Exhibits C and D—Nifty and ClickUp Pricing Pages

Finally, Defendant argues that Exhibits C and D are appropriate subjects of the incorporation-by-reference doctrine and, in the alternative, judicial notice.  *See* RJN at 6–7.  In support, Defendant asserts that Nifty references "ClickUp's pricing pages numerous times in the Complaint as crucial support for the allegation that ClickUp utilized Nifty's trade secrets . . . ."  RJN at 6.

The Court disagrees with Defendant's incorporation-by-reference argument.  Though Nifty does indeed, as Defendant points out, reference Exhibit D—Nifty's 2021 pricing page—several times in the Complaint, Compl. ¶¶ 36, 50, not once does Nifty reference Exhibit C—ClickUp's 2020 pricing page.  Exhibit C may add, in Defendant's view, much needed context to the trade secret misappropriation claims.  But the Court is hard-pressed to understand how a webpage nowhere mentioned or even alluded to in the Complaint could "form the basis of the complaint."  *Ritchie*, 342 F.3d at 908.  And as to Exhibit D, Plaintiff's passing references to Nifty's 2021 pricing page are not so extensive as to meet the standard under *Ritchie*.  *See id.*, 342 F.3d at 908

On the other hand, Defendant correctly notes that "[c]ourts have taken judicial notice of internet archives in the past, including Archive.org's 'Wayback Machine,' finding that Archive.org possesses sufficient indicia of accuracy that it can be used to readily determine

the various historical versions of a website." *Kinnee v. TEI Biosciences Inc.*, No. 22-CV-604 JLS (DDL), 2023 WL 8191097, at *3 (S.D. Cal. Nov. 27, 2023) (quoting *EVO Brands, LLC v. Al Khalifa Grp. LLC*, 657 F. Supp. 3d 1312, 1322 (C.D. Cal. 2023)). Plaintiff does not appear to contest Defendant's judicial notice argument and, in turn, the Court **GRANTS** Defendant's request for judicial notice as to Exhibits C and D, subject to the caveat that the Court "cannot take judicial notice of disputed facts" contained therein. *See id.* (quoting *Khoja*, 899 F.3d at 999).

## MOTION TO DISMISS

### I.   Legal Standard

Federal Rule of Civil Procedure 12(b)(6) permits a party to raise by motion the defense that the complaint "fail[s] to state a claim upon which relief can be granted." To survive a 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the facts pled "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* That is not to say that the claim must be probable, but there must be "more than a sheer possibility that a defendant has acted unlawfully." *Id.* Facts "'merely consistent with' a defendant's liability" fall short of a plausible entitlement to relief. *Id.* (quoting *Twombly*, 550 U.S. at 557).

Though this plausibility standard "does not require 'detailed factual allegations,' . . . it [does] demand[] more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (quoting *Twombly*, 550 U.S. at 555). In other words, a complaint will not suffice "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (alteration in original) (quoting *Twombly*, 550 U.S. at 557). Put differently, "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

Review under Rule 12(b)(6) requires a context-specific analysis involving the Court's "judicial experience and common sense." *Iqbal*, 556 U.S. at 679. In performing

that analysis, "a district court must accept as true all facts alleged in the complaint, and draw all reasonable inferences in favor of the plaintiff." *Wi-LAN Inc. v. LG Elecs., Inc.*, 382 F. Supp. 3d 1012, 1020 (S.D. Cal. 2019). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (second alternation in original). If a complaint does not survive Rule 12(b)(6), a court grants leave to amend unless it determines that no modified contention "consistent with the challenged pleading could . . . possibly cure the deficiency." *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986).

## II. Analysis

### A. *Trade Secret Misappropriation Claims*

The Court first considers Defendant's argument that Plaintiff's trade secret misappropriation claims should be dismissed because Plaintiff failed to sufficiently identify its trade secrets and allege misappropriation. Mem. at 12. Plaintiff brings trade secret claims under both the Defend Trade Secrets Act ("DTSA")—a federal law—and the California Uniform Trade Secrets Act ("CUTSA"). Compl. ¶¶ 57–74. The Court will analyze these claims together "because the elements are substantially similar." *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 657 (9th Cir. 2020). To sufficiently state a claim under either statute, "a plaintiff must prove: (1) that the plaintiff possessed a trade secret, (2) that the defendant misappropriated the trade secret; and (3) that the misappropriation caused or threatened damage to the plaintiff." *Id.* at 657–58. Defendant contests the first two elements.

#### 1. *Ownership of Protectable Trade Secret*

A trade secret is "(1) information, (2) that is valuable because it is unknown to others, and (3) that the owner has attempted to keep secret" through reasonable measures. *Id.* at 657, 660. Defendant argues that Plaintiff does not adequately allege any protectable trade secrets because it fails to (1) sufficiently describe its trade secrets; and (2) distinguish / / /

its asserted secrets from publicly known information.[3]  Mem. at 12–17.

To adequately identify a trade secret, the plaintiff must "describe the subject matter of the trade secret with *sufficient particularity* to separate it from matters of general knowledge in the trade or of special knowledge of those persons . . . skilled in the trade." *Imax Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161, 1164–65 (9th Cir. 1998) (alteration in original) (quoting *Universal Analytics, Inc. v. MacNeal-Schwendler Corp.*, 707 F. Supp. 1170, 1177 (C.D. Cal. 1989), *aff'd*, 914 F.2d 1256 (9th Cir. 1990)). "Plaintiffs may not simply rely upon 'catchall' phrases or identify categories of trade secrets they intend to pursue at trial." *InteliClear*, 978 F.3d at 658.  However, "the reasonable particularity standard is a flexible one that does not require explication of the trade secrets 'down to the finest detail or require a mini-trial on misappropriation before [the] plaintiff is allowed discovery.'"  *Alphonso Inc. v. Tremor Video, Inc.*, No. 22-CV-03629-NC, 2022 WL 17968081, at *2 (N.D. Cal. Oct. 31, 2022) (quoting *STEMCELL Techs. Can. Inc. v. StemExpress, LLC*, No. 21-CV-01594-VC (LB), 2022 WL 585668, at *4 (N.D. Cal. Feb. 24, 2022)).  Nonetheless, "[i]dentifying trade secrets with sufficient particularity is important because defendants need 'concrete identification' to prepare a rebuttal." *InteliClear*, 978 F.3d at 658 (quoting *Imax*, 152 F.3d at 1167).

Plaintiff identifies the following sets of trade secrets in the Complaint:

> Nifty's customer conversion metrics; how Nifty was able to obtain its high conversion rates; the enabling structure and logic of its microservice structure; its customer data (in both raw and structured form); information concerning its customers' identities, needs, and preferences; Nifty's logic and process for

---

[3] Defendant advances two more arguments in a footnote in its Reply that Nifty failed to take reasonable measures to protect its trade secrets and that Nifty's DTSA claim is barred under the statute's three-year statute of limitations.  Reply at 6 n.1.  The Court declines to reach these arguments as a "district court need not consider arguments raised for the first time in a reply brief."  *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007).

synchronization of updates for customers; and Nifty's methods
and techniques for optimizing the functionality of its products,
as developed for its own use and/or use by its customers.

Compl. ¶¶ 58, 67 (cleaned up).  For the reasons provided below, the Court finds that Plaintiff fails to allege any protectable trade secrets.

### a.  Nifty's Customer Information

As part of its asserted list of protectable trade secrets, Plaintiff includes several categories that pertain to customer information.  These categories include: (1) customer conversion metrics; (2) customer data; and (3) customers' identities, needs, and preferences.  *Id.*  Defendant challenges these categories on two grounds—that the categories are too vague, Mem. at 14, and that the customer information "is publicized, not secret."

As to the first ground, Defendant may be correct that, without more, "conclusory and generalized allegations" of trade secrets may be insufficient, *Vendavo, Inc. v. Price f(x) AG*, No. 17-CV-06930-RS, 2018 WL 1456697, at *3–4 (N.D. Cal. Mar. 23, 2018), but Plaintiff's allegations relating to customer information go well beyond the minimum threshold of specificity.  The purpose of the "sufficient particularity" standard is "to define the contours of discovery and to distinguish the trade secrets from matters within general or even highly specialized knowledge within the field."  S*ee Social Apps, LLC v. Zynga, Inc.*, No. 4:11-CV-04910 YGR, 2012 WL 2203063, at *4 (N.D. Cal. June 14, 2012).  In regard to customer information, Plaintiff easily meets the standard.

Plaintiff specifies that the customer information it seeks to assert as a trade secret includes "annual revenue rate by customer, monthly revenue rate by customer, sales registered by customer, historical trends of daily average users, historical trends of monthly average users, lists of paid customers, lists of free customers, [and] customer conversion rates."  Compl. ¶ 31.  Unlike the plaintiff in *Vendavo*, who provided no coloring as to what its allegations of "customer lists and customer related information" entailed, Plaintiff here left plenty of breadcrumbs by which Defendant could "ascertain at least the boundaries

within which the secret lies." *Pellerin v. Honeywell Int'l, Inc.*, 877 F. Supp. 2d 983, 988 (S.D. Cal. 2012) (quoting *Diodes, Inc. v. Franzen*, 67 Cal. Rptr. 19, 24 (Ct. App. 1968)). The Court has no trouble discerning the contours of these alleged trade secrets.

As to the second ground, however, Plaintiff fails to allege that the customer information is not within public purview. Plaintiff alleges that much of the protected customer information was only shared with Defendant upon execution of the September 20, 2021 LOI, and that Plaintiff shared some of "its most sensitive financial and marketing information" in the data room. Compl. ¶¶ 30–31. Included in this information were the categories of customer information listed in the preceding paragraph. *Id.* at ¶ 31. But as Defendant points out, it is the plaintiff's "burden to explain that [the information shared under a confidentiality provision] did not merely reflect facts that would be known to any other" company in the industry. *Agency Solutions.Com, LLC v. TriZetto Grp, Inc.*, 819 F. Supp. 2d 1001, 1020 (E.D. Cal. Sept. 13, 2011).

Plaintiff cannot meet this burden by superficially stating that the shared customer information was "sensitive." True, despite Defendant's protestations otherwise, the strong weight of authority holds that "customer-related information [can] qualif[y] as a trade secret, especially if a plaintiff has spent 'considerable time, effort, and resources,' in developing some of that information." *Albert's Organics, Inc. v. Holzman*, 445 F. Supp. 3d 463, 472 (N.D. Cal. 2020) (quoting *MAI Sys. Corp. v. Peak Comput., Inc.*, 991 F.2d 511, 521 (9th Cir. 1993)). And, here, the Court finds it reasonable to believe that some of the customer information shared under the LOI may have been closely held by Plaintiff such that it is not readily ascertainable by the public. But "[w]hether information constitutes a trade secret is a question of fact," *Beebe v. Mobility, Inc.*, No. 07CV1766 BTM (NLS), 2008 WL 474391, at *2 (S.D. Cal. Feb. 20, 2008), and simply "[l]abeling information as a trade secret or as confidential information," *Thompson v. Impaxx, Inc.*, 7 Cal. Rptr. 3d 427, 431 (Ct. App. 2003), is precisely the type of "[t]hreadbare recital[] of the elements of a cause of action" that is insufficient at the pleading stage," *Iqbal*, 556 U.S. at 678. Thus, although Plaintiff sufficiently identifies

what customer information is being asserted as a trade secret, it fails to allege sufficient facts for the Court to determine whether that information may be widely known in the industry such that trade secret protection is defeated.

> b.  Structure and Logic of Nifty's Microservice Architecture

Plaintiff next asserts "the enabling structure and logic of its microservice structure" as a trade secret.  Compl. ¶¶ 58, 67.  As an initial matter, it is not entirely clear from the Complaint if Plaintiff's purported trade secret is microservices architecture in the abstract or Plaintiff's selected embodiment of a microservices architecture.   In its Opposition, Plaintiff argues the latter, conceding "that 'microservice' structure in general is not an actionable trade secret because it is a 'common' architecture."  Opp'n at 14.

Whichever tack Plaintiff takes, however, the Complaint fails to identify a protectable trade secret.  Plaintiff's concession in its Opposition that microservices architecture in the abstract is not protectable is apt, as the Complaint itself describes a microservices architecture as one of "two *common* architectural designs for the back end or server-side of a web application: monolith-based and microservice-based."  Compl. ¶ 23 (emphasis added).  Such a high-level claim is clearly barred from protection as it is a fundamental principle of trade secret law that a trade secret must be distinguishable "from matters of general knowledge in the trade or of special knowledge of those persons . . . skilled in the trade."  *Diodes*, 67 Cal. Rptr. at 24.  Because microservice-based architecture is generally known in the industry, as Plaintiff concedes, it is not a protectable trade secret.

Alternatively, if the alleged trade secret is the microservice-based architecture that Plaintiff itself created, the Complaint still fails to assert a protectable trade secret.  "Ideas or concepts are not, in and of themselves, trade secrets[, and] [p]roprietary ways of doing the same thing that others in the same field do are not trade secrets."  *TriZetto*, 819 F. Supp. 2d at 1017 (citing *Silvaco Data Sys. v. Intel Corp.*, 109 Cal. Rptr. 3d 27, 38–39 (Ct. App. 2010)).   Though "computer software can qualify for trade secret protection," *MAI Sys.*, 991 F.2d at 522, plaintiff owes the Court a duty to provide "a particularized description of an alleged trade secret," so that the Court can then determine

if misappropriation has taken place.  *See id.*  In other words, Plaintiff must specifically identify what it is about its proprietary microservice-based architecture that is not an idea already within the public sphere.

Here, Plaintiff alleges its microservices architecture "provide[s] several benefits," but the only one that Plaintiff clearly identifies is "the ability to reliably scale its own product."  Compl. ¶ 23.  In the same breath, however, Plaintiff describes "scalability" as one of the chief advantages recognized by the industry of microservice-based architecture over monolith-based architecture.  *Id.*  Aside from this one generally-known feature of its architecture, Plaintiff sheds no light on what aspects of its architecture are different from what others in the industry are doing.  Identifying a "trade secret as 'server architecture' clearly is far too general" a description; more is needed "to identify the actual matter that is claimed to be a trade secret."  *Zynga*, 2012 WL 2203063, at *4.  Accordingly, Plaintiff fails to allege its microservices architecture as a trade secret.

> c. How Nifty Obtained High Conversion Rates and Nifty's Logic and Process for Synchronizing Updates

Plaintiff asserts two more trade secrets—how Nifty obtained high conversion rates and the logic and process for synchronizing updates—to which Defendant raises similar arguments as to why Plaintiff failed to plausibly allege protectable trade secrets.  Again, the Court agrees with Defendant.

As to Nifty's process for obtaining high customer conversion rates, Plaintiff argues that it disclosed sensitive marketing information to Defendant "in the data room set up as part of the due diligence process."  Opp'n at 16.  But Plaintiff does not specifically identify what it was about its process for achieving high customer conversion rates it shared with Defendant.  To allege a protectable trade secret, Plaintiff must plead sufficiently specific facts that "*clearly refer* to tangible trade secret material."  *Imax*, 152 F.3d at 1167.  An amorphous process for optimizing conversion rates that Plaintiff does not clearly state does not suffice.  The only instance in which Plaintiff points to anything "tangible" is in regard to its pricing page, which Plaintiff alleges "was a major contributor to Nifty's impressive

conversion rates." Compl. ¶ 36. Plaintiff argues that Defendant "learned, among other things, *how and why* Nifty's pricing landing page contributed to Nifty's successful rate," and that Defendant "changed its pricing landing page" as a result. Opp'n at 16.

This argument is a non-starter, however, because Plaintiff's pricing page was publicly available to anyone who wished to see it. Plaintiff cites no cases in its Opposition supporting the proposition that a pricing plan on a publicly available website could constitute a trade secret, nor could it.[4] Once "a trade secret [is] disclosed to others, or others are allowed to use [the trade secret], the holder of the trade secret has lost his property interest . . . ." *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1011 (1984). Here, Plaintiff alleges no facts to show that it took any measures, let alone reasonable measures, to keep the pricing plan secret.

The same is true of Plaintiff's logic and process for synchronizing updates for customers. The court in *Social Apps, LLC v. Zynga, Inc.*, recognized that "while patent law protects ideas, concepts and design, trade secret law protects factual, empirical data." 2012 WL 2203063, at *4 (citing *Silvaco*, 109 Cal. Rptr. 3d at 38–39). In that case, the plaintiff "only offered the most general concepts to describe what it believe[d]" to be protectable trade secrets. *Id.* at *5. Plaintiff, here, falls into the same trap. Plaintiff has not "identified a specific file name or source code line numbers" such that it has properly identified a trade secret. *Id.* at *4. Other than a vague description of having "created a way to synchronize updates between its users and Nifty's mobile apps without requiring a user to be online to receive updates," Plaintiff does not map this functionality onto any

---

[4] Regarding Plaintiff's cited cases, the Court agrees with the bottom-line rule of law that a misappropriation claim can be built upon circumstantial evidence. But as those cases suggest, the trade secret at issue must still be defined with the requisite specificity. S*ee ATS Prods., Inc. v. Champion Fiberglass, Inc.*, No. 13-02403, 2014 WL 466016, at *3 (N.D. Cal. Feb. 3, 2014) (alleging trade secrets consisting of ingredients, and their relative weights, for making fire-safe plastics); *SOAProjects, Inc. v. SCM Microsystems, Inc.*, No. 10-01773, 2010 WL 5069832, at *11 (N.D. Cal. Dec. 7, 2010) (alleging trade secrets consisting of "proprietary technical documents [and] copies of [the plaintiff's] white papers). Moreover, none of the trade secrets in those cases were publicly available online. Here, however, how Plaintiff obtained high conversion rates is much too amorphous a description and Plaintiff's pricing plan was readily accessible by all.

"tangible trade secret material." *Imax*, 152 F.3d at 1167.  Plaintiff cannot protect as a trade secret a "logic" or "process" that is not clearly defined.

> d.    Nifty's Methods and Techniques for Optimizing Product Functionality

For similar reasons, the Court also finds that Plaintiff's "methods and techniques for optimizing the functionality of its products" do not constitute trade secrets.  In referencing its "methods and techniques," Plaintiff does not refer to any "tangible trade secret material" such that those general categories could be protectable as trade secrets. *See id.*  With such vague allegations, the Court is unable to analyze what might separate Plaintiff's "methods and techniques" from any other software company's "methods and techniques."  There is little doubt that software companies from A to Z strive to "optimize product functionality."

In its Opposition, Plaintiff only argues "that it shared aspects of [its] innovative platform and the trial-and-error process surrounding its development [with Defendant] during the technical deep-dive call" on October 5, 2021.  Opp'n at 19.  But the only method or technique that Plaintiff alleges it shared with Defendant on said call that the Court can identify with particularity is Plaintiff's document-tagging feature.  Compl. ¶ 34.  The document-tagging feature would indeed meet the "sufficient particularity" standard if the mechanism behind its functionality was Plaintiff's asserted trade secret.  But Plaintiff has not provided any information about its document-tagging feature that it argues was misappropriated or alleged any facts that suggest the feature is not generally known in the industry.  Therefore, Plaintiff's methods and techniques for optimizing the functionality of its products, as alleged in the Complaint, are not protectable trade secrets.

Having not plausibly alleged any protectable trade secrets, Plaintiff has failed to state a claim for either of its trade secret misappropriation causes of action.  Accordingly, Claims 1 and 2 are **DISMISSED**.  The Court could stop here, but it will briefly consider Defendant's other principal trade secret argument that Plaintiff has not plausibly alleged misappropriation.

/ / /

### 2. *Misappropriation*

To plead misappropriation under the DTSA and CUTSA, the plaintiff must show "the '(1) [a]cquisition of a trade secret by another person who knows or has reason to know that the trade secret was acquired by improper means;' or the '(2) [d]isclosure or use of a trade secret of another without express or implied consent.'" *Alta Devices, Inc. v. LG Elecs., Inc.*, 343 F. Supp. 3d 868, 882 (N.D. Cal. 2018) (citing 18 U.S.C. § 1839(5); Cal. Civ. Code § 3426.1(b)).  Though "[a]llegations of similarity, without more, do not support a claim of misappropriation of trade secrets," *Brown v. Adidas Int'l*, 938 F. Supp. 628, 634 (S.D. Cal. 1996), "allegations of similarities . . . when accompanied by allegations of exactly how defendants improperly obtained the alleged trade secrets" is sufficient, *Alta Devices*, 343 F. Supp. 3d at 883.  Plaintiff alleges that Defendant both improperly acquired and improperly used its trade secrets.  Compl. ¶¶ 62, 70.

As to the allegations of improper acquisition, Plaintiff's argument is two-fold.  *First*, Plaintiff argues that Defendant engaged in bad-faith negotiations to acquire Nifty's trade secrets "under the guise of a transaction."  Opp'n at 19.  Defendant allegedly feigned a trusting relationship with Plaintiff while the Parties were considering a possible transaction despite the reality that Defendant was never truly interested in acquiring Nifty in the first place.  Defendant did so, according to Plaintiff, as a pretext for learning Plaintiff's trade secrets.  *Second*, Plaintiff argues that Defendant improperly acquired secret information when its founder and CEO Evans "presumably . . . scraped substantial data off [P]laintiff's website, which [D]efendants then used to enhance [its] own website."  *Id.* at 21.

As to the allegations of improper use, Plaintiff argues that Defendant violated "the specific use limitation and obligation of confidentiality set forth in the NDA" that the Parties signed on September 7, 2021.  Opp'n at 19.  Plaintiff argues that the NDA obligated Defendant to only use Nifty's trade secrets "in evaluating or pursuing a business relationship between" them.  *Id.* (quoting the NDA).

/ / /

/ / /

In its Motion, Defendant argues that Plaintiff failed to allege that any protected trade secrets were "even *accessible* to ClickUp in the first place, let alone that ClickUp accessed, acquired, or used [them]."  Mot. at 19.  Also missing from the Complaint, Defendant argues, was "how the information was obtained, or even that ClickUp retained access outside the window when the parties were negotiating the deal."  *Id.*

For purposes of the following discussion, the Court assumes for argument's sake that Plaintiff had indeed plausibly alleged protectable trade secrets.  Even under that assumption, however, Plaintiff's arguments that Defendant engaged in misappropriation fall short.

### a.   Improper Acquisition

The Court begins with Plaintiff's argument that Defendant entered into negotiations with Nifty as a pretext for obtaining its trade secrets, thereby misappropriating the trade secrets by improper acquisition.  The Complaint narrates the winding negotiations between Nifty and ClickUp, moving from Defendant's first request for a software demonstration on June 21, 2021, Compl. ¶¶ 25–26, to Defendant's final offer to hire Nifty's founders on January 28, 2022, *id.* ¶ 49.  Along the way, Plaintiff alleges Defendant "pressed for access to Nifty confidential information as part of the 'due diligence' process," which involved setting up "a data room for Nifty to share its most sensitive financial and marketing information."  *Id.* ¶ 31.  Plaintiff also alleges Defendant's Head of Engineering, Shailesh Kumar, "urg[ed] . . . Nifty [to] share[] information about its document-tagging feature, its ability to synchronize updates for customers and the 'microservices' architecture of its product—all very closely held trade secrets."  *Id.* ¶ 34.

Although these allegations sufficiently identify discreet events during which Defendant could have acquired trade secrets (if plausibly alleged), Plaintiff fails to "allege[] sufficient nonconclusory factual content to demonstrate that Defendants 'misled Plaintiff in order to use Plaintiff's trade secrets'" to improve Defendant's own products.  *Giostar Therapy, LLC v. Bioscience Ams. LLC*, No. CV-18-02788-PHX-SRB, 2019 WL 7841723, at *3 (D. Ariz. Apr. 22, 2019).  It is not enough to allege Defendant

"received the alleged trade secrets pursuant to [an] NDA." *Space Data Corp. v. X*, No. 16-cv-03260-BLF, 2017 WL 5013363, at *2 (N.D. Cal. Feb. 16, 2017).  More than that, Plaintiff must allege at least some facts that plausibly suggest Defendant intended the NDA and related confidentiality provisions to be a sham.

Plaintiff cites several cases in its brief, but none supports its position that improper acquisition can result from a simple business negotiation turned sour.  The closest Plaintiff gets is *E. & J. Gallo Winery v. Instituut Voor Landbouw—En Visserijonderzoek*, No. 1:17-cv-00808-DAD-EPG, 2018 WL 2463869 (E.D. Cal. June 1, 2018), but that case is distinguishable.  In *E. & J. Gallo*, the plaintiff developed a product that allowed organic food products to dry faster and more efficiently.  2018 WL 2463869, at *1.  The defendants expressed interest in purchasing the dryer so the plaintiffs, under the protection of an NDA, shared certain trade secrets related to the dryer with them.  *Id.*  The defendants, however, later withdrew from the purchase and "began developing a copy of the [dryer] using [the] plaintiffs' trade secrets without paying for such use."  *Id.*

Although the court denied the defendants' motion to dismiss, in part, because the plaintiffs "alleged 'exactly how Defendants improperly obtained . . . the alleged trade secret," *id.* at *7 (alteration in original) (quoting *Autodesk, Inc. v. ZWCAD Software Co.*, No. 5:14-cv-01409-EJD, 2015 WL 2265479, at *6 (N.D. Cal. May 13, 2015)), the plaintiffs alleged an important fact that is missing here.  In that case, the defendants misrepresented themselves to the plaintiffs "as a research institute, not a commercial concern" when they requested the demonstration.  *Id.* at *1.  That misrepresentation, right off the bat, makes the demonstration in *E. & J. Gallo* different from the negotiations between Nifty and ClickUp.  Here, ClickUp represented from the very beginning that it was a business competitor with an interest in Nifty's software,[5] s*ee* Compl. ¶ 26, and

---

[5] Plaintiff alleges that its first interaction with Defendant resulted from an online inquiry in which Defendant's representative used a personal email address rather than a business address, Compl. ¶ 25, but the Court does not infer, nor does Plaintiff allege, any attempt at misrepresentation by this action.  Indeed, the representative "disclosed that he was ClickUp's Head of Business" when he showed up for the demonstration.  *Id.* ¶ 26.

Plaintiff alleges no other facts that imply deception or dishonesty.[6]  The lack of factual allegations of bad faith is fatal to Plaintiff's argument that Defendant improperly acquired purported trade secrets during the business negotiations.

Alternatively, Plaintiff argues that Defendant improperly acquired trade secrets when Evans "signed up as a Nifty customer and studied Nifty's product for more than two-and-a-half-years."  Opp'n at 20.  Plaintiff relies on a case out of the Eleventh Circuit, *Compulife Software Inc. v. Newman*, 959 F.3d 1288 (11th Cir. 2020), for the proposition that using a "website over an extended period of time . . . is misappropriation" because "Evans presumably took data off Nifty's platform, bit-by-bit, much like what [the] defendants accomplished in *Compulife Software*."  *Id.* at 21.

Plaintiff's reliance is misplaced for at least two reasons.  *First*, the plaintiff in *Compulife Software* specifically identified what exactly it was that the defendants had aggregated off a publicly accessible website—a compilation of life insurance quotes. *Compulife Software*, 959 F.3d at 1314.  To the contrary, Plaintiff does not state what Evans may have pulled off Nifty's website.  At most, Plaintiff argues that Evans "presumably took data," Opp'n at 13, but it does not elaborate on what type of data or how much data Evans took.  The *Compulife Software* court noted that a defendant must take at least a "substantial portion" of the purported trade secret to establish liability, 959 F.3d at 1314, and, even if the Court were to adopt that standard, Plaintiff fails to allege as much.  *Second*, the defendants in *Compulife Software* used *robots* to "collect more quotes than any human practicably could."  *Id.*  Here, Plaintiff alleges only that Evans manually accessed Nifty's website, an act that even the *Compulife Software* court said was "unlikely ever to constitute improper means."  *Id.*  Accordingly, *Compulife Software* does not support—indeed, it

---

[6] The Court does not credit Plaintiff's allegation that Evans hid behind a "false name" when he signed up for a Nifty account using the name "Tyler."  Compl. ¶ 20.  As the Complaint itself acknowledges, Tyler is Evans's middle name, and Evans regularly used the name "Tyler" during sales calls.  *Id.* ¶¶ 18, 20. Even "draw[ing] all reasonable inferences in favor of the plaintiff," the Court is unable to conclude that these allegations plausibly amount to deception or bad faith.  *Wi-LAN*, 382 F. Supp. 3d at 1020.

undermines—Plaintiff's theory that Defendant misappropriated trade secrets by improper acquisition.

b.   Improper Use

In addition to rooting its trade secret misappropriation claims in improper acquisition, Plaintiff argues that Defendant misappropriated trade secrets by improper use. Granting for the sake of argument that Defendant did obtain possession of protectable trade secrets during the business negotiations, the question then becomes whether or not Defendant improperly used them.   Plaintiff argues that Defendant violated "the specific use limitation and obligation of confidentiality set forth in the NDA" by using trade secrets obtained during the business negotiations for its own commercial advantage rather than purely for "evaluating or pursuing a business relationship . . . ." Opp'n at 19.   Meanwhile, Defendant argues that Nifty fails to "allege how the information was obtained, or even that ClickUp retained access outside the window when the parties were negotiating the deal," falling short of a plausible theory of misappropriation.   Mot. at 19.

Plaintiff has the better of the arguments, at least with respect to certain of the asserted trade secrets.   At the pleading stage, it is well-settled "that a complaint may . . . rely on circumstantial allegations of a defendant's misappropriation." *Yeiser Rsch. & Dev. LLC v. Teknor Apex Co.*, 281 F. Supp. 3d 1021, 1048 (S.D. Cal. 2017).   Although "[a] court will not permit a plaintiff to 'conduct a fishing expedition based upon . . . bare allegations' of misappropriation," *id.* (alteration in original) (quoting *Accenture Glob. Servs. GMBH v. Guidewire Software Inc.*, 581 F. Supp. 2d 654, 663 (D. Del. 2008)), "it would be unreasonable to require [Plaintiff] to demonstrate . . . the precise ways in which Defendant[] may have used [Plaintiff's] trade secrets, given that Defendant[] [is] the only one[] who possess[es] such information," *Vinyl Interactive, LLC v. Guarino*, No. C 09-0987 CW, 2009 WL 1228695, at *8 (N.D. Cal. May 1, 2009).

Here, Plaintiff plainly identifies discreet instances when Defendant may have gained access to purported trade secrets, *i.e.*, in the data room where Nifty shared "its most sensitive financial and marketing information," Compl. ¶ 31, and during the technical

deep-dive call between Nifty and Kumar on October 5, 2021, where "Nifty shared information about its document-tagging feature, its ability to synchronize updates for customers and the 'microservices' architecture of its products—all very closely held trade secrets," *id.* ¶ 34.  These allegations go above and beyond what is minimally required as "there is no requirement that [Plaintiff] plead exactly how Defendant[] 'improperly obtained [or used] the alleged trade secret.'" *Autodesk*, 2015 WL 2265479, at *6 (quoting *Gaetano Assocs. Ltd. v. Artee Collections, Inc.*, No. 05 Civ. 3329(DLC), 2006 WL 3026080, at *2 (S.D.N.Y. Oct. 25, 2006)).  Contrary to Defendant's argument otherwise, there is no requirement for Defendant to have retained access to trade secrets once the information has been committed to memory, s*ee Klamath-Orleans Lumber, Inc. v. Miller*, 151 Cal. Rptr. 118, 119 (Ct. App. 1978), so after Defendant was exposed to protected information, it had an obligation to not use that information for improper purposes.

Moreover, Plaintiff alleges certain actions by Defendant that go beyond mere speculation of misappropriation.  Plaintiff alleges that Defendant announced "a 'revolutionary' document-tagging feature that mirrored the equivalent feature of Nifty's product, which allowed tasks and documents to be tagged in the same categories." Compl. ¶ 50.  Plaintiff also alleges that Defendant "changed its pricing page . . . to a design that was remarkably similar to Nifty's page" and that "ClickUp began to release updates that seemed coincidentally to align with trade secrets and confidential and proprietary information Nifty had shared with ClickUp under the NDA." *Id.*  Plaintiff, therefore, does not "merely alleg[e] similarity between two products," but alleges when Defendant obtained access to the purported trade secrets and the subsequent release of a product bearing a similarity to those trade secrets.  *See E. & J. Gallo*, 2018 WL 2463869, at *7.

Therefore, the Court concludes that, had Plaintiff plausibly alleged ownership of trade secrets pertaining to the document-tagging feature, the pricing page, or various other aspects of its platform, the Complaint contains adequate factual allegations to state a claim for trade secret misappropriation by improper use.  Nevertheless, as discussed above,

Plaintiff has failed to plausibly identify any protectable trade secrets, so it has failed to state a claim for trade secret misappropriation under the DTSA and CUTSA.

### B.   Unfair Competition Law ("UCL") Claim

The Court now considers Defendant's arguments that Plaintiff's UCL claim should be dismissed.   Section 17200 of California's Business and Professions Code "broadly proscribes 'unfair competition,' including 'any unlawful, unfair or fraudulent business act or practice.'"   *Waymo LLC v. Uber Techs., Inc.*, 256 F. Supp. 3d 1059, 1062 (N.D. Cal. 2017) (quoting *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 973 P.2d 527, 539 (1999)).   Plaintiff accuses Defendant of violating this broad proscription by way of the following acts:

> creating an account with a fake username to track and implement for itself the latest Nifty updates, locking Nifty into exclusivity arrangements with no intent to close a deal, taking advantage of Nifty's willingness to share information with ClickUp about its product under the guise of an asset purchase transaction, copying the look and feel of Nifty's product, continuously releasing updates of ClickUp's product that included copies of prior updates made by Nifty, and misrepresenting Nifty's product through false blog posts.

Compl. ¶ 76.   In support of its position, Defendant advances three arguments: (1) The UCL claim is preempted, (2) Nifty lacks statutory standing to bring the claim, and (3) Nifty fails to state a claim upon which relief can be granted.   Mem. at 19–20.

### 1.   Preemption

A claim is preempted by CUTSA to the extent that claim "is based on the 'same nucleus of facts as the misappropriation of trade secrets claim.'"   *Copart, Inc. v. Sparta Consulting, Inc.*, 277 F. Supp. 3d 1127, 1157 (E.D. Cal. 2017) (quoting *K.C. Multimedia, Inc. v. Bank of Am. Tech. & Operations, Inc.*, 90 Cal. Rptr. 3d 247, 261 (Ct. App. 2009)).   Specifically, and as relevant here, "depending on the particular facts pleaded, the statute

24

can operate to preempt" claims for unfair competition.  *See K.C. Multimedia*, 90 Cal. Rptr. 3d at 261.

Courts have had no trouble finding UCL claims preempted by CUTSA where the "unfair competition claim rests squarely on its factual allegations of trade secret misappropriation."  *Id.* at 264; *see also Digital Envoy, Inc. v. Google, Inc.*, 370 F. Supp. 2d 1025, 1035 (N.D. Cal. 2005); *Waymo*, 256 F. Supp. 3d at 1064.  This trend holds true even where, as here, the information alleged to be a trade secret fails to satisfy the legal definition.  *See SunPower Corp. v. SolarCity Corp.*, No. 12-CV-00694-LHK, 2012 WL 6160472, at *4–5 (N.D. Cal. Dec. 11, 2012) (reasoning that the California Supreme Court would conclude that CUTSA preempts claims "based on the misappropriation of confidential or proprietary information that nevertheless fails to qualify as a trade secret under CUTSA").

Plaintiff takes no issue with the basic premise that CUTSA preempts claims based on the "same nucleus of facts as the misappropriation of trade secrets claim."  *Copart*, 277 F. Supp. 3d at 1157.  Instead, Plaintiff argues that its "claim under the UCL is not preempted because the facts supporting this claim are distinct from the facts supporting the trade secret claims."  Opp'n at 22.

Plaintiff is correct, but only with respect to its factual allegations related to Defendant's misrepresentation of Nifty's product through false blog posts.  Plaintiff's theory of trade secret misappropriation revolves around a business negotiation gone wrong. *See generally* Compl.  That theory subsumes nearly all of the conduct that Plaintiff alleges to be unlawful, unfair, and/or fraudulent in violation of Section 17200.  "Track[ing] and implement[ing] for itself the latest Nifty updates, locking Nifty into exclusivity arrangements with no intent to close a deal, [and] taking advantage of Nifty's willingness to share information with ClickUp about its product under the guise of an asset purchase transaction" are the core elements of Plaintiff's unfair competition theory.  *See* Compl. ¶ 76.  Because that conduct makes up the precise nucleus of facts on which Plaintiff's trade secret misappropriation claim is built, the UCL claim is preempted to the extent it relies on

such conduct.

However, Defendant's blog post that Plaintiff alleges to include false representations of its product is a distinct action that has little to no relation to Defendant's alleged misappropriation of trade secrets.  To the extent that Plaintiff's unfair competition claim relies "on these other, non-theft related allegations," the claim survives CUTSA preemption.  *See Copart*, 277 F. Supp. 3d at 1160; *Titan Glob. LLC v. Organo Gold Int'l, Inc.*, 2012 WL 6019285, at *10 (N.D. Cal. Dec. 2, 2012) (denying motion to dismiss UCL claim on preemption grounds where the claim was "based upon defamation and misleading income representations [sic]").

### 2.    Statutory Standing

With the bulk of the UCL claim preempted by CUTSA, the Court is left with a single theory under which Plaintiff can bring that claim: a fraud-based theory that Defendant made false and misleading representations to customers about Nifty's product.  Defendant argues that, for Plaintiff to prevail under this theory, it must "demonstrate 'actual reliance' on the allegedly deceptive or misleading statements," Mot. at 21, and "allege that it lost money or property as a result of the allegedly false statements . . .," *id.* at 22.

Before addressing the merits of Defendant's argument, the Court takes a moment to clarify an important point.  The UCL protects against three distinct business practices— those "that are (1) unlawful, (2) unfair, or (3) fraudulent."  *Backhaut v. Apple, Inc.*, 74 F. Supp. 3d 1033, 1050 (N.D. Cal. 2014) (citing Cal. Bus. & Prof. Code § 17200).  "Each of these prongs 'is a separate and distinct basis for liability,'" *Snapkeys, Ltd. v. Google LLC*, No. 19-CV-02658, 2020 WL 6381354, at *3 (N.D. Cal. Oct. 30, 2020) (quoting *Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718, 731 (9th Cir. 2007)), with California courts having set forth different standards depending upon which theory the plaintiff brings its case.

Under any of the prongs, however, the UCL requires a showing that the plaintiff "has suffered injury in fact and has lost money or property *as a result* of the unfair competition."  Cal. Bus. & Prof. Code § 17204 (emphasis added).  The meaning of "as a

result" in the statute has troubled courts since the imposition of this statutory standing requirement in 2004, but the California Supreme Court clarified that, at least with respect to claims under the fraud prong, the UCL "imposes an actual reliance requirement." *In re Tobacco II Cases*, 207 P.3d 20, 39 (Cal. 2009) ("*Tobacco II*").

Plaintiff's Opposition appears to argue that "actual reliance" need not be shown because Plaintiff is bringing a UCL claim under the "unfair" prong in addition to the "fraud" prong, the former of which has a lower causation threshold.[7] Opp'n at 24–25. But as Plaintiff concedes in its Opposition, when a "UCL claim *sounds in fraud*, [the plaintiff is] required to prove 'actual reliance on the allegedly deceptive or misleading statements . . . .'" *Sateriale v. R.J. Reynolds Tobacco Co.*, 697 F.3d 777, 793 (9th Cir. 2012) (emphasis added) (quoting *Kwikset Corp. v. Superior Court*, 246 P.3d 877, 888 (Cal. 2011)). And a UCL claim "sounds in fraud" based on the facts of the claim, not the label Plaintiff gives it. *Hale v. Sharp Healthcare*, 108 Cal. Rptr. 3d 669, 679 (Ct. App. 2010) (applying "actual reliance" to a claim brought under the unlawful prong because "the predicate unlawful conduct [was] misrepresentation"). Thus, Plaintiff must allege "actual reliance," even under the "unfair" prong, so long as its claim sounds in fraud.

Here, regardless of which prong Plaintiff chooses to hang its UCL claim on, what remains after CUTSA preemption is fundamentally "a fraud theory involving false advertising and misrepresentation to consumers." *Tobacco II*, 207 P.3d at 39 n.17. Plaintiff only points to "statements by ClickUp on [its] website [that] were patently false and designed to harm the market in the project management software space." Opp'n at 26. Relying solely on Defendant's allegedly false review of its product, Plaintiff's claim "sounds in fraud," and, as a result, must satisfy the "actual reliance" requirement under any prong of the UCL.

/ / /

---

[7] Plaintiff concedes in its Opposition that Defendant's conduct does not satisfy the "unlawful" prong of the UCL, only advancing arguments under the "unfair" and "fraudulent" prongs. *See* Opp'n at 17 ("Nifty's UCL claim survives even without pleading a violation of any law.").

That said, the Parties acknowledge that there is a split in authority regarding the "actual reliance" requirement.  "'No California court has addressed' whether 'competitor plaintiffs must plead their own reliance or whether pleading consumer reliance is sufficient for fraudulent business practice claims brought by competitors.'"  *A White and Yellow Cab, Inc. v. Uber Techs., Inc.*, No. 15-cv-05163-JSW, 2017 WL 1208384, at *8 (N.D. Cal. Mar. 31, 2017) (quoting *Heartland Payment Sys., Inc. v. Mercury Payment Sys., LLC*, No. 14-cv-00437-CW, 2015 WL 3377662, at *7 (N.D. Cal. Feb. 24, 2015)).  In some instances, California district courts have required actual reliance by the plaintiff itself.  *See, e.g.*, *L.A. Taxi Coop., Inc. v. Uber Techs., Inc.*, 114 F. Supp. 3d 852, 867 (N.D. Cal. 2015) (joining "the majority of courts to have addressed this question" by requiring actual reliance by the competitor plaintiff).  In other instances, California district courts have gone the other way.  *See, e.g.*, *Scilex Pharms. Inc. v. Sanofi-Aventis U.S. LLC*, No. 21-cv-01280-JST, 2021 WL 11593043, at *7 (N.D. Cal. Aug. 16, 2021) ("disavow[ing] its holding[] in *L.A. Taxi*" by allowing a plaintiff statutory standing by showing consumer reliance alone).

The Court need not resolve the split at this time because, either way, Plaintiff fails to allege that it suffered an injury "as a result of" a misrepresentation by Defendant.  *See Kwikset*, 246 P.3d at 888.  "[R]eliance is the causal mechanism of fraud," *Tobacco II*, 207 P.3d at 39, but here, Plaintiff alleges only that it lost "customers and significant revenue" as a result of market confusion from "the 'street news' that Nifty that had [sic] been copying ClickUp's product, when the truth was the opposite."  Compl. ¶ 54.  This street news about who copied who has no apparent nexus to the allegedly misleading statements that Defendant may have made in its blog post about Nifty's custom automation ability and dashboard offerings.  *Id.* ¶ 53.  Because Plaintiff does not "show that the misrepresentation was an immediate cause of the injury-producing conduct [*i.e.*, customers fleeing Nifty's product]," Plaintiff has not shown "actual reliance" as needed to state a claim on a fraud-based unfair competition theory.  Even if it did, Plaintiff provides nothing more than a conclusory allegation that it lost "customers and significant revenue," *id.* ¶ 54, an allegation that, on its own, "does not plausibly allege a loss of money or property,"

*Creative Mobile Techs., LLC v. Flywheel Software, Inc.*, No. 16-cv-02560-SI, 2016 WL 7102721, at *3 (N.D. Cal. Dec. 6, 2016).   Accordingly, Claim III is **DISMISSED**.  Once again, the Court could stop here but will offer a brief look at whether Plaintiff has stated a claim under either the "unfair" prong or "fraudulent" prong of the UCL.

### 3.   Failure to State a Claim

#### a.   Unfair Conduct

To state a claim under the "unfair" prong of the UCL, a plaintiff must allege "conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." *Cel-Tech*, 973 P.2d at 565.  "In order to allege that conduct '*significantly* threatens or harms competition,' a plaintiff must allege harm to the market as a whole." *Snapkeys*, 2020 WL 6381354, at *3 (quoting *Drum v. San Fernando Valley Bar Ass'n*, 106 Cal. Rptr. 3d 46, 51 (Ct. App. 2010)).  This is because "[i]njury to a competitor is not equivalent to injury to competition; only the latter is the proper focus of antitrust laws." *Cel-Tech*, 973 P.2d at 544 (first citing *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990); and then citing *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488–89 (1977)).

Plaintiff contends in opposition to the Motion that its allegations of Defendant's conduct are sufficient to state a claim under the "unfair" prong of the UCL "because the allegations demonstrate harm to the market as a whole," Opp'n at 26, but the Court disagrees that any such allegations can be found in the Complaint.  The Complaint identifies two statements from the 2021 blog post that it alleges to be false and misleading, Compl. ¶ 53, but contrary to the Opposition, nowhere does the Complaint allege that the statements were "designed to harm the market in the project management software space." Opp'n at 26.  Plaintiff seems to conjure these allegations out of whole cloth to fill in critical gaps necessary to state a claim under the "unfair" prong.  But false statements on a blog post about Nifty do not *ipso facto* amount to market-wide impact.  And even if Plaintiff

had indeed alleged such generalized harm to the market as it argues in its Opposition, such "conclusory allegations of competitive harm" would still fail to meet the minimum requirements the case law demands. *See Snapkeys*, 2020 WL 6381354 at *4 (citing *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1136–37 (9th Cir. 2014)).

b.   Fraudulent Conduct

To state a claim under the "fraudulent" prong of the UCL, a plaintiff must show that "'members of the public are likely to be deceived' by the challenged conduct." *Bardin v. DaimlerChrysler Corp.*, 39 Cal. Rptr. 3d 634, 636 (Ct. App. 2010) (quoting *Schnall v. Hertz Corp.*, 93 Cal. Rptr. 2d 439, 457 (Ct. App. 2000)). Such "[c]laims . . . are subject to the particularity requirements of Federal Rule of Civil Procedure 9(b)." *In re Anthem, Inc. Data Breach Litig.*, No. 15-MD-2617-LHK, 2016 WL 3029783, at *34 (N.D. Cal. May 27, 2016). "A plaintiff, therefore, must plead the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what the person obtained thereby." *Tracy Anderson Mind and Body, LLC v. Roup*, No. CV 22-4735-RSWL-Ex, 2022 WL 17670418, at *7 (C.D. Cal. Dec. 12, 2022).

With respect to the Rule 9(b) particularity requirement, Plaintiff meets the mark. Nifty alleges with particularity a specific blog post from November 2021—authored by Managing Editor Erica Chappell—in which Defendant "posted a review of Nifty's product on its website that contained false information about Nifty." Compl. ¶ 53; Ex. B. And Nifty did not stop there. It identified specific statements—"that Nifty's product did not 'let you build your own automation' . . . [and] that Nifty did not offer dashboards"—that it claims were false. *Id.* Because Plaintiff alleges Defendant made several specific statements that were provably false, it has "provided an adequate factual basis for its assertion that Defendant's [statements were] false or misleading." *Hadley v. Kellogg Sales Co.*, 243 F. Supp. 3d 1074, 1092 (N.D. Cal. 2017). Indeed, one of the purposes of Rule 9(b) is "to provide defendants with adequate notice to allow them to defend the charge," *id.* at 1091, and Defendant can hardly argue inadequate notice when it itself asks

/ / /

30

the Court to take judicial notice of the blog post at issue, s*ee* RJN at 5.[8]

The trouble, as alluded to above in the Court's discussion of statutory standing, is that Plaintiff fails to allege that any customers *actually relied* on any misrepresentations in the blog post.  Plaintiff also fails to allege, as it must, that the false statements in the blog post are likely to deceive customers.  *See Bardin*, 39 Cal. Rptr. 3d at 636.  Thus, Plaintiff's "fraud" theory is not so much plagued by lack of particularity under Rule 9(b) as it is by the lack of facts alleging the likelihood of deception, actual reliance by customers, and a corresponding injury by Plaintiff as a result of said reliance.

## C.    Good Faith and Fair Dealing Claim

The Court concludes with Defendant's final argument that Plaintiff fails to state a claim for breach of the implied covenant of good faith and fair dealing.  *See* Mot. at 25–26.  Under Delaware law—which governs actions arising out of the September 7, 2021 NDA ("NDA," Ex. A, ECF No. 1-2)[9]—courts may "fill in the spaces between the written words" when gaps arise in an agreement that the parties failed to foresee.  *Glaxo Grp. Ltd. v. DRIT LP*, 248 A.3d 911, 919 (Del. 2021).  The implied covenant, however, "is 'a limited and

---

[8] The bare allegations in the Complaint regarding the 2021 blog post may very well have been insufficient to satisfy the Rule 9(b) particularity requirement.  *See BP West Coast Prods., LLC v. Crossroad Petroleum, Inc.*, 2013 WL 12377979, at *3 (S.D. Cal. Dec. 3, 2013) ("[A]ttributing a misrepresentation to a corporate entity . . . is inadequate; a specific person must be named, or at least identified." (citing *Kriendler v. Chem. Waste Mgmt., Inc.*, 877 F. Supp. 1140, 1155 (N.D. Ill. 1995))).  But, at Defendant's request, the Court incorporated the blog post by reference and, after doing so, sufficient details emerge that would have been otherwise absent.  *See* Ex. B, ECF No. 21-5 at 2 (identifying Managing Editor, Erica Chappell, as the author of the November 11, 2021 blog post).

[9] Under Section 11 of the NDA, "[the NDA] and any action related thereto will be governed, controlled, interpreted, and defined by and under the laws of the State of Delaware . . . ."  NDA at 3.  A contractual choice-of-law provision is enforceable in California if (1) "the chosen state has a substantial relationship to the parties or their transaction, or whether there is any other reasonable basis for the parties' choice of law" and (2) "the chosen state's law is [not] contrary to a fundamental policy of California."  *Nedlloyd Lines B.V. v. Superior Court*, 834 P.2d 1148, 1152 (Cal. 1992) (en banc).  Where, as here, at least one of the parties to a contract is incorporated in the chosen state (Delaware), *see* Compl. ¶ 2, the parties are deemed to have a substantial relationship to the state. *Yeiser Rsch & Dev.*, 281 F. Supp. 3d at 1036 (citing *id.* at 1153).  Moreover, neither party has argued—nor does the Court determine—that Delaware law on this issue runs contrary to a fundamental policy of California.  Thus, the Court will apply Delaware law to the breach of implied covenant of good faith and fair dealing claim.

extraordinary legal remedy' . . . [that] cannot be invoked 'when the contract addresses the conduct at issue.'" *Id.* at 920 (first quoting *Nemec v. Shrader*, 991 A.2d 1120, 1128 (Del. 2010); and then quoting *Oxbow Carbon & Mins. Holdings, Inc. v. Crestview-Oxbow Acquisition, LLC*, 202 A.3d 482, 507 (Del. 2019)). "Where the express terms of a contract speak directly to the issue in dispute, those terms will always 'supersede' the implied covenant." *Yeiser Rsch. & Dev.*, 281 F. Supp. 3d at 1056.

Plaintiff invokes the implied covenant to hold Defendant liable for three specific actions: (1) "[t]aking advantage of Nifty's willingness to share information with ClickUp about its product under the guise of an asset purchase transaction," (2) "[d]emanding that Nifty share its Confidential Trade Secret Information to maintain a good relationship for a deal that ClickUp did not intend to close," and (3) "[i]mplementing Nifty's Confidential Trade Secret Information into its own product to increase its own profitability while decreasing its offers to Nifty."

Each of these accused violations of the implied covenant is already expressly set forth in the NDA, precluding their availability as the basis of an implied covenant of good faith and fair dealing. The NDA obligates Defendant to "hold in strict confidence and . . . use the Confidential Information of [Plaintiff] for no purpose other than the Permitted Use"—defined as "evaluating or pursuing a business relationship between the parties." NDA at 2. Notwithstanding this sole permitted use, the NDA expressly disclaims "any obligation on the part of either Party to enter into any further agreement with the other . . ." *Id.* at 3. The NDA further prohibits Defendant from "mak[ing], hav[ing] made, us[ing] or sell[ing] for any purpose any product or other item using, incorporating or derived from any Confidential Information of the Disclosing Party." *Id.*

The accused violations are all subsumed by the aforementioned contractual provisions. Defendant was permitted to acquire and hold any information shared under the NDA solely for the purpose of evaluating or pursuing a possible business relationship so, to the extent Defendant may have obtained such information "under the guise of an asset purchase transaction," that conduct was already contemplated by the NDA. Defendant was

also under no obligation to enter into any further post-NDA agreements so, to the extent Defendant "did not intend to close" a deal, that conduct was also already contemplated by the NDA.  Finally, Defendant was prohibited from incorporating any information shared under the NDA for any purpose so, to the extent Defendant implemented protected information into its own product, that conduct was already contemplated by the NDA.

The covenant of good faith and fair dealing is only to be implied "when it is clear from the writing that the contracting parties '*would have* agreed to proscribe the act later complained of . . . had they thought to negotiate with respect to that matter.'"  *Dunlap v. State Farm Fire and Cas. Co.*, 878 A.2d 434, 442 (Del. 2005) (alteration in the original) (emphasis added) (quoting *Katz v. Oak Indus., Inc.*, 508 A.2d 873, 880 (Del. Ch. 1986)). Such a claim is merely meant to bridge the gap mistakenly left open by the parties when they fail to forecast unexpected circumstances.  In a case such as this, it strikes the Court that the very essence of the NDA was to shield Plaintiff from the allegedly nefarious conduct it complains of now.  The NDA is, by its very terms, the protection Plaintiff desired.  Accordingly, Claim V is **DISMISSED WITH PREJUDICE**.  *Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876, 892–93 (9th Cir. 2010) ("[T]he district court may exercise its discretion to deny leave to amend due to . . . 'futility of amendment.'" (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

## CONCLUSION

In light of the foregoing, the Court **GRANTS** Defendant's Motion to Dismiss (ECF No. 21).  The Complaint's breach of the implied covenant of good faith and fair dealing and—to the extent it is preempted by CUTSA—unfair competition claims are **DISMISSED WITH PREJUDICE**.  The claims for trade secret misappropriation and what remains of the claim for unfair competition after CUTSA preemption are **DISMISSED WITHOUT PREJUDICE**.

As the Court cannot definitively conclude doing so would be futile, the Court will provide Plaintiff the opportunity to amend.  *See Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000).  Within twenty-one (21) days of this Order, Plaintiff either **(1) SHALL**

**FILE** an amended complaint, or **(2) SHALL INDICATE** to the Court that it will not do so. *Failure to timely select either of the above options may result in the dismissal of Claims 1–3 and 5 pursuant to Federal Rule of Civil Procedure 41(b)*. *See Applied Underwriters, Inc. v. Lichtenegger*, 913 F.3d 884, 890–91 (9th Cir. 2019) (explaining courts may dismiss an action under Rule 41(b) when a plaintiff fails to comply with a court order requiring the filing of an amended complaint). Any amended complaint must be complete in and of itself without reference to Plaintiff's original Complaint; claims not realleged in the amended complaint will be considered waived. *See* S.D. Cal. CivLR 15.1; *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 928 (9th Cir. 2012) (noting claims dismissed with leave to amend that are not realleged in an amended pleading may be "considered waived").

   **IT IS SO ORDERED**

Dated:  September 17, 2024

Hon. Janis L. Sammartino
United States District Judge

24-CV-194 JLS (AHG)