UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

NIFTY TECHNOLOGIES, INC., a New York corporation,

Plaintiff,

v.

MANGO TECHNOLOGIES, INC., a Delaware corporation, d/b/a CLICKUP,

Defendant.

Case No.:  24-CV-194 JLS (AHG)

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT**

(ECF No. 37)

Presently before the Court are Defendant Mango Technologies, Inc. d/b/a ClickUp's ("Defendant" or "ClickUp") Motion to Dismiss Plaintiff's First Amended Complaint ("Mot.," ECF No. 37) and Memorandum of Points and Authorities in Support thereof ("Mem.," ECF No. 48).  Plaintiff Nifty Technologies, Inc. ("Plaintiff" or "Nifty") filed an Opposition to the Motion ("Opp'n," ECF No. 49), and ClickUp filed a Reply ("Reply," ECF No. 50).  Having carefully reviewed Nifty's First Amended Complaint ("FAC," ECF No. 26), the Parties' arguments, and the law, the Court **GRANTS IN PART** and **DENIES IN PART** ClickUp's Motion.

/ / /

/ / /

# BACKGROUND

According to Nifty, project management software allows businesses "to facilitate and optimize the planning, execution, monitoring, and successful completion of projects." FAC ¶ 26. Since 2016, Nifty has been a leader in the project management software industry, having "successfully created a cutting-edge, all-in-one collaboration software that unites the functionality of project management apps with other experiences such as chat, document collaboration, file storage and other customer needs." *Id.* ¶ 17. The following year, Nifty alleges that ClickUp opted to enter the industry as well but soon ran into difficulties "with performance and scalability." *Id.* ¶¶ 18, 20. These difficulties, according to Nifty, influenced ClickUp to seek a merger between the two companies. *Id.* ¶ 26.

The initial approach for the merger came about during the summer of 2021 when ClickUp's Head of Business, Tommy Wang, requested a demonstration of Nifty's software through a link on Nifty's website. *Id.* ¶ 26. That demonstration led to an introductory call between Nifty's CEO, Shiv Kapoor, and ClickUp's CEO, Zeb Evans. *Id.* ¶ 27. By Nifty's account, Evans expressed optimism during the call that, together, the two companies could "upend the market." *Id.* ¶ 27. So with that, ClickUp began courting Nifty as a potential partner in a merger, *id.* ¶ 28, and Nifty's leaders reciprocated the warm sentiments having found themselves impressed with ClickUp's overtures, *id.* ¶ 29.

Merger negotiations then began in the usual course. The Parties entered into a non-disclosure agreement ("NDA") on September 7, 2021, providing for a controlled exchange of confidential material so ClickUp's team could conduct due diligence. *Id.* ¶ 29. About two weeks later, the Parties executed a Letter of Intent ("LOI") whereby ClickUp memorialized its non-binding, tentative understanding that it would acquire Nifty's assets for $3 million in cash plus $16 million in ClickUp stock. *Id.* ¶ 31. The LOI also contained an exclusivity clause prohibiting Nifty from considering any other acquisition proposals through December 31, 2021. *Id.*; *see also* FAC, Ex. D ("LOI Contract") at 3, ECF No. 26-4. Soon thereafter, the due diligence period, which consisted of both a technical portion and financial portion, began.

From ClickUp's side, the technical portion was led by Senior Vice President of Engineering Shailesh Kumar.  FAC ¶ 33.  Kumar orchestrated a deep-dive technical call, in which he requested a two-and-a-half-hour call allowing him to vet Nifty's product philosophy, code, and product architecture.  *Id.*  In a September 29, 2021 email, Kumar specifically solicited the following information: (1) an architecture deep dive; (2) a high level code walkthrough; (3) technologies that Nifty uses; (4) open source libraries that Nifty uses; (5) a high level walkthrough of code structure and code quality; (6) an operational walkthrough of Nifty's continuous integration and continuous deployment ("CI/CD"), or how Nifty releases code; (7) automation gates in place; (8) how Nifty Scales; (9) and challenges Nifty has faced.  *Id.* ¶ 34.  Kumar also requested one-on-one conversations with Nifty's engineers.  *Id.*

The deep-dive technical call took place on October 5, 2021.  *Id.* ¶ 36.  Nifty alleges that it "provided the specific information requested by Kumar in his September 29, 2021 email," and that such information constituted "very closely held trade secrets that give Nifty an economic advantage over its competitors."  *Id.*  Attached to Nifty's FAC is an Exhibit B, which purportedly discloses in detail the asserted trade secrets.  *See* FAC, Ex. B, ECF No. 34.  On October 6, 2021—the day after the deep-dive technical call—Kumar hosted the requested one-on-one interviews with Nifty's engineers, but by Nifty's recollection, the interviews "lasted only a few minutes and seemed perfunctory . . . ."  FAC ¶ 40.

The financial portion of the due diligence on ClickUp's side was initiated by Wang and then handled by a financial analyst by the name of Tyler Heffernan.  *Id.* ¶¶ 32, 35.  Wang urged Nifty to set up a data room, where Nifty allegedly shared with ClickUp: (1) Nifty's historical and current financial statements, (2) annual revenue rate by customer, (3) monthly revenue rate by customer, (4) sales registered by customer, (5) historical trends of daily average users, (6) historical trends of monthly average users, (7) lists of paid customers, (8) lists of free customers, (9) an organization chart, (10) lists of employees, (11) valuations of Nifty, and (12) Nifty's success rate with converting free users to paying

customers.  *Id.* ¶ 32.  Nifty alleges that it shared this information, all of which constitutes protectable trade secrets, with ClickUp in the data room.  *Id.* ¶ 38.  Nifty further alleges that it "shared that its conversion rate was well above the industry standard" in a separate phone call between unidentified affiliates of Nifty and ClickUp.  *Id.*  The customer data information is also disclosed in Exhibit B.

Following the due diligence period in October 2021, ClickUp allegedly tendered "a few half-hearted offers . . . but none made economic sense to Nifty's founders."  *Id.* ¶ 40. The negotiations eventually fizzled, but Nifty soon suspected that ClickUp had been improperly using Nifty's trade secrets to improve ClickUp's products.  *Id.* ¶¶ 41–42.  For example, Nifty noticed that ClickUp had "changed its pricing page—for the first time since its launch in 2017—to a design that was remarkably similar to Nifty's page."  *Id.* ¶ 41. Moreover, Kumar boasted publicly in early 2023 about ClickUp's "transition to a service-based architecture," which Nifty alleges was undertaken at a rapid pace only made possible with access to Nifty's proprietary architecture.  *Id.* ¶ 42.  Nifty also learned in 2023 that ClickUp had made several false claims about Nifty's software in product reviews of Nifty's product in 2021.  *Id.* ¶ 43.  Nifty alleges that it lost potential customers as a result of the false blog posts.  *Id.* ¶ 44.

Nifty brought this action on January 30, 2024, alleging: (1) the misappropriation of trade secrets under the federal Defend Trade Secrets Act and the California Uniform Trade Secrets Act, (2) the violation of Section 17200 of California's Business and Professions Code ("Unfair Competition Law" or "UCL"), (3) breach of contract, and (4) breach of the implied covenant of good faith and fair dealing.  *See* ECF No. 1.  The Court previously dismissed all claims in the Complaint other than the breach of contract claim, ECF No. 25 ("MTD Order"), prompting Nifty to file the FAC on October 8, 2024, *see* FAC.  The FAC renews Nifty's trade secret misappropriation, UCL, and breach of contract claims, though it drops the breach of the implied covenant of good faith and fair dealing claim.  ClickUp filed the instant Motion on December 13, 2024, seeking dismissal of all but the breach of contract claim.  *See* Mot.

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) permits a party to raise by motion the defense that the complaint "fail[s] to state a claim upon which relief can be granted."  To survive a 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible when the facts pled "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*.  That is not to say that the claim must be probable, but there must be "more than a sheer possibility that a defendant has acted unlawfully."  *Id*.  Facts "'merely consistent with' a defendant's liability" fall short of a plausible entitlement to relief.  *Id*. (quoting *Twombly*, 550 U.S. at 557).

Though this plausibility standard "does not require 'detailed factual allegations,' . . . it [does] demand[] more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Id*. (quoting *Twombly*, 550 U.S. at 555).  In other words, a complaint will not suffice "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  *Id*. (alteration in original) (quoting *Twombly*, 550 U.S. at 557).  Put differently, "a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555.

Review under Rule 12(b)(6) requires a context-specific analysis involving the Court's "judicial experience and common sense."  *Iqbal*, 556 U.S. at 679.  In performing that analysis, "a district court must accept as true all facts alleged in the complaint, and draw all reasonable inferences in favor of the plaintiff."  *Wi-LAN Inc. v. LG Elecs., Inc.*, 382 F. Supp. 3d 1012, 1020 (S.D. Cal. 2019).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'"  *Iqbal*, 556 U.S. at 679 (second alternation in original).  If a complaint does not survive Rule 12(b)(6), a court grants leave to amend unless it determines that no modified contention "consistent

/ / /

with the challenged pleading could . . . possibly cure the deficiency." *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986).

**ANALYSIS**

**I.    Trade Secret Misappropriation Claims**

The Court first considers ClickUp's arguments relating to Nifty's trade secret misappropriation claims.  ClickUp raises multiple grounds upon which it believes the claims fail, including both that Nifty fails to sufficiently identify the existence of a trade secret and that Nifty fails to plausibly allege misappropriation of the customer data secrets. Mem. at 3.  Although Nifty asserts two trade secret misappropriation claims—one under the federal Defend Trade Secrets Act ("DTSA") and the other under the California Uniform Trade Secrets Act ("CUTSA")—the Court will analyze these claims together "because the elements are substantially similar." *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 657 (9th Cir. 2020).  To sufficiently state a claim under either statute, "a plaintiff must prove: (1) that the plaintiff possessed a trade secret, (2) that the defendant misappropriated the trade secret; and (3) that the misappropriation caused or threatened damage to the plaintiff." *Id.* at 657–58.

**A.    *Ownership of a Protectable Trade Secret***

A trade secret is "(1) information, (2) that is valuable because it is unknown to others, and (3) that the owner has attempted to keep secret" through reasonable measures. *Id.* at 657, 660.  ClickUp argues that Nifty does not plausibly allege any protectable trade secrets because it fails to: (1) describe its trade secrets with sufficient particularity, (2) distinguish its asserted secrets from publicly known information, and (3) sufficiently identify its customer conversion rate trade secret.  Mem. at 4–15.  The Court addresses these in turn, but it will combine its analysis of arguments (1) and (3) as they present largely overlapping contentions.

**1.    *Sufficient Particularity***

To adequately identify a trade secret, the plaintiff must "describe the subject matter of the trade secret with *sufficient particularity* to separate it from matters of general

knowledge in the trade or of special knowledge of those persons . . . skilled in the trade." *Imax Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161, 1164–65 (9th Cir. 1998) (alteration in original) (emphasis in original) (quoting *Universal Analytics, Inc. v. MacNeal-Schwendler Corp.*, 707 F. Supp. 1170, 1177 (C.D. Cal. 1989), *aff'd*, 914 F.2d 1256 (9th Cir. 1990)). "Plaintiffs may not simply rely upon 'catchall' phrases or identify categories of trade secrets they intend to pursue at trial." *InteliClear*, 978 F.3d at 658. However, "the reasonable particularity standard is a flexible one that does not require explication of the trade secrets 'down to the finest detail or require a mini-trial on misappropriation before [the] plaintiff is allowed discovery.'" *Alphonso Inc. v. Tremor Video, Inc.*, No. 22-CV-03629-NC, 2022 WL 17968081, at *2 (N.D. Cal. Oct. 31, 2022) (quoting *STEMCELL Techs. Can. Inc. v. StemExpress, LLC*, No. 21-CV-01594-VC (LB), 2022 WL 585668, at *4 (N.D. Cal. Feb. 24, 2022)). Nonetheless, "[i]dentifying trade secrets with sufficient particularity is important because defendants need 'concrete identification' to prepare a rebuttal." *InteliClear*, 978 F.3d at 658 (quoting *Imax*, 152 F.3d at 1167).

In Exhibit B, Nifty enumerates 44 specific trade secrets that it alleges are legally protected. These 44 trade secrets are divided into five distinct categories: (1) Technical Architecture Trade Secrets (Trade Secrets 1–15), (2) Real-Time Update Solution Trade Secrets (Trade Secrets 16–21), (3) Platform Optimization Techniques Trade Secrets (Trade Secrets 22–34), (4) Customer Conversion Metrics Trade Secrets (Trade Secrets 35–37), and (5) Customer Data Trade Secrets (Trade Secrets 38–44). Because Exhibit B has been filed under seal, *see* ECF No. 33, the Court takes care to conceal the specifics Nifty provides therein. That said, the publicly filed FAC contains descriptive allegations that cross-reference Exhibit B in such a way that allows the Court to discuss the purported trade secrets in considerable detail. The Court finds that ClickUp's arguments are best addressed by marching through the groupings as shaped by the Parties, so it will proceed in that fashion.

/ / /

a.    Technical Architecture Trade Secrets (Trade Secrets 1–15)

Nifty generally describes its Technical Architecture Trade Secrets as "the development path undertaken to make the platform reliably scale . . . as well as relevant platform code and its quality . . . ."  FAC ¶ 50.a.  In the FAC, Nifty offers illustrative examples of said trade secrets, and then in Exhibit B, Nifty spells out in full detail what those purported trade secrets are.  As examples, Nifty alleges in its FAC that the following are protectable trade secrets:

> Nifty's backend technical architecture, including what services to use and how many instances of each is configured to execute and why; at precisely what average CPU utilization is autoscaling configured for each environment to manage the traffic and why; precisely how many in-memory data store and cache service need to run in the production environment and how each must be accessible and why; [and] precisely how many "cron" services and proxy services need to run in each server instance and whether or not that instance needs to be configured to be a part of any scaling group . . . .

FAC ¶ 50.a.  The above list continues on in a similar manner through Trade Secret 14.

Exhibit B naturally begins with Trade Secret 1—which is described as Nifty's backend technical architecture—and it progresses sequentially through Trade Secrets 2–11 and 13 by incorporating Trade Secret 1 with a follow-on "wherein" clause that describes selected features of the backend architecture.  Whereas the allegations in the FAC describe those architectural features in a general sense, Exhibit B fills in the specifics.  By way of example, the FAC alleges as a trade secret "precisely how many 'cron' services and proxy services need to run in each server instance and whether or not that instance needs to be configured to be a part of any scaling group," *id.* ¶ 50.a., while Exhibit B, in paragraph 9, states what was left unsaid, i.e., Exhibit B expressly discloses the number of cron and proxy services that are configured by Nifty's backend architecture.

Trade Secrets 12, 14, and 15 are a bit different.  Trade Secret 12 claims the "code structure (including the frameworks, libraries, plugins)" of ten different named micro-structures, each of which is identified in Exhibit B.  Trade Secret 14 claims the "code

structure and implementation details surrounding recent updates," of which there are eleven listed in paragraph 14 of Exhibit B.  And Trade Secret 15 claims the generalized knowledge that Trade Secrets 1–14 have value and importance.

With respect to Trade Secret 1, which claims "Nifty's backend technical architecture," the Court agrees with ClickUp that such a description is too vague to warrant trade secret protection.  As the Court held in its previous dismissal Order, "[i]dentifying a trade secret as server architecture clearly is far too general a description; more is needed to identify the actual matter that is claimed to be a trade secret."  MTD Order at 15 (internal quotation marks omitted) (quoting *Social Apps, LLC v. Zynga, Inc.*, No. 4:11-CV-04910 YGR, 2012 WL 2203063, at *4 (N.D. Cal. June 14, 2012)).  Nifty resists this conclusion by arguing that, in Exhibit B, "Nifty set forth the blueprint for its architecture," Opp'n at 6, but as the Seventh Circuit observed in *IDX Systems Corporation v. Epic Systems Corporation*, "a plaintiff must do more than just identify a kind of technology and then invite the court to hunt through the details in search of items meeting the statutory definition," 285 F.3d 581, 584 (7th Cir. 2002).  Such a tactic amounts to little more than, as ClickUp puts it, a "data dump[] of technical references to sift through." Reply at 4 (citing *Apple Inc. v. Allan & Assocs. Ltd.*, 445 F. Supp. 3d 42, 59 (N.D. Cal. 2020)).

However, Nifty's failure to plead Trade Secret 1 with sufficient particularity does not necessarily doom the remainder of the Technical Architecture Trade Secrets.  Trade Secrets 2–11 and 13 incorporate Trade Secret 1, but they claim specific individual components of the incorporated backend architecture.  Thus, those Trade Secrets start by identifying a general category of information (i.e., the architecture) and then conclude by qualifying those categories with the specific subject matter at issue (i.e., the information contained in the "wherein" clauses).  Such "subject matter qualifications . . . allow defendants a level of detail that is sufficient to ascertain at least the boundaries within which the secrets lie and the scope of appropriate discovery."  *Cisco Sys., Inc. v. Chung*, 462 F. Supp. 3d 1024, 1051 (N.D. Cal. 2020) (citation modified).

Citing *Zynga*, ClickUp argues that the "wherein" clauses "add[] little more than an elaborate categorization scheme for a variety of related concepts," Mem. at 7, but the allegations here are much more refined than the ones in *Zynga*. There, the plaintiff failed to "specifically identify[] and describe[e] the actual architecture that [the plaintiff] claims was stolen." *Zynga*, 2012 WL 2203063 at *4. But here, the "wherein" clauses add substantial detail to put ClickUp on notice of which parts of Nifty's architecture comprise the trade secrets. *Zynga* is also distinguishable because, in that case, the plaintiff failed to point out where the trade secrets "might be found in the information it turned over to [the defendant] in the course of 'due diligence.'" *Id.* Not so here. The FAC makes quite clear that discovery revolving around the Technical Architecture Trade Secrets will be limited exclusively to the October 5, 2021 deep-dive technical call conducted by Shailesh Kumar.[1] *See* FAC ¶¶ 36, 50.a. Courts have consistently held that trade secrets "become sufficiently particularized for purposes of stating a claim where the complaint alleges that [the trade secrets] are contained within" a specified communication. *Beluca Ventures LLC v. Einride Aktiebolag*, 660 F. Supp. 3d 898, 908 (N.D. Cal. 2023) (collecting cases).

The analysis of Trade Secrets 12, 14, and 15 follows in the same vein. Trade Secrets 12 and 14 begin by claiming a category (i.e., code structure and implementation details) and then continue on by qualifying those categories with the specific subject matter to which they pertain. ClickUp analogizes Nifty's allegations to those from *Synopsys, Inc. v. ATopTech, Inc.*, but the claimed trade secrets here are more polished than the ones in that case. No. C 13-cv-02965 SC, 2013 WL 5770542, at *6 (N.D. Cal. Oct. 24, 2013) (rejecting claimed trade secrets of "proprietary input and output formats, scripts, and technical product documentation" as too conclusory). And unlike ClickUp's other cited cases, which rejected asserted trade secrets because they "identified the subject matter . . . but failed to identify or define the category of information," Nifty identified both

---

[1] To the extent Nifty believes any of the Technical Architecture Trade Secrets may have been exchanged at some point other than the October 5, 2021 deep-dive technical call, no such plausible allegations are included in the FAC.

the relevant categories and the relevant subject matter. *See Creative Writer Software, LLC v. Schechter*, No. CV 23-02471-MWF (MAAx), 2023 WL 6786796, at *4 (C.D. Cal. Sept. 6, 2023). Finally, the Court finds that Nifty alleges Trade Secret 15 with sufficient particularity given that the claimed secret is necessarily "circumscribed by the preceding list[] of trade secrets." *Masimo Corp. v. Apple Inc.*, No. SACV 20-48 JVS (JDEx), 2021 WL 925885, at *3 (C.D. Cal. Jan. 6, 2021).

In sum, Trade Secret 1 lacks the requisite specificity at the pleading stage, but Nifty's remaining Technical Architecture Trade Secrets are pled with sufficient particularity.

> b. Real-Time Update Solution Trade Secrets (Trade Secrets 16–21) and Platform Optimization Techniques Trade Secrets (Trade Secrets 22–34)

The FAC and Exhibit B utilize a similar framework for the Real-Time Update Solution Trade Secrets and Platform Optimization Techniques Trade Secrets as they do for the just-discussed Technical Architecture Trade Secrets. Both sets of trade secrets begin with a broader category—as described in Trade Secret 16 for the Real-Time Update Solution Trade Secrets and Trade Secret 22 for the Platform Optimization Techniques Trade Secrets—followed by a series of trade secrets incorporating the broader category, each of which is narrowed by a "wherein" clause that focuses on a specific feature therein. The two sets of trade secrets then conclude in the same manner as the Technical Architecture Trade Secrets—that is, with an asserted trade secret claiming the generalized knowledge that the preceding list of trade secrets has value and importance.

ClickUp's arguments with respect to the Real-Time Update Solution Trade Secrets and Platform Optimization Techniques Trade Secrets mirror those challenging the Technical Architecture Trade Secrets. The Court's conclusions likewise resemble those from the above discussion.

Trade Secret 16 claims "the combinations of Nifty's frontend and backend technical architecture," FAC ¶ 50.b., but that asserted trade secret fails for the same reason as Trade Secret 1. *See Zynga*, 2012 WL 2203063, at *4 (reasoning that "server architecture clearly

is far too general a description"). Trade Secrets 17–20, however, take the generalized category of "frontend and backend technical architecture" from Trade Secret 16 and add more color by claiming particular elements of that architecture through the use of "wherein" clauses. Such an identification is sufficient at the pleading stage, particularly in light of Plaintiff's allegation that the information was exchanged in a particular communication, i.e., the October 5, 2021 deep-dive technical call.[2]  FAC ¶ 50.b.; *see Alta Devices, Inc. v. LG Elecs., Inc.*, 343 F. Supp. 3d 868, 881 (N.D. Cal. 2018) (reasoning that the defendant "can hardly claim it is unable to determine what trade secrets" were asserted when the purported trade secrets were "exchanged pursuant to [a non-disclosure agreement]"). And Trade Secret 21 is alleged with sufficient particularity for the same reason as Trade Secret 15 above. *See Masimo*, 2021 WL 925885, at *3.

The Court's analysis of the Platform Optimization Techniques Trade Secrets is exactly the same as that of the Real-Time Update Solution Trade Secrets with one exception. Whereas the Court found in the preceding paragraph that Trade Secret 16 is not described with sufficient particularity, the Court finds that Trade Secret 22 is satisfactorily described. In its previous dismissal Order, the Court faulted Nifty for leaving vague which product optimization methods and techniques were being claimed as trade secrets, MTD Order at 17, but Nifty remedied that failure in the FAC by specifically identifying its CI/CD technique as the claimed trade secret, FAC ¶ 50.c. In its Motion, ClickUp contends that Nifty "fails to identify the particular 'techniques' at issue," but that assertion is demonstrably contradicted by the preceding sentence where ClickUp itself identifies the CI/CD technique at issue. Mem. at 8. In fact, according to the allegations in the FAC, it was ClickUp who specifically requested information pertaining to CI/CD on the October 5, 2021 deep-dive technical call, which ClickUp understood at the time to be Nifty's

---

[2] Again, to the extent Nifty believes any of the Real-Time Update Solution Trade Secrets may have been exchanged at some point other than the October 5, 2021 deep-dive technical call, no such plausible allegations are included in the FAC.

technique for releasing code.  FAC ¶ 34.  Accordingly, Trade Secret 22 is alleged with sufficient particularity as are Trade Secrets 23–34, which derive therefrom.

              c.      Customer Conversion Metrics Trade Secrets (Trade Secrets 35–37) and Customer Data Trade Secrets (Trade Secrets 38–44)

Nifty also asserts as its Customer Conversion Metrics Trade Secrets its "unusually high customer conversion metrics" as Trade Secret 35, its knowledge as to "how and why Nifty obtained its above-market customer conversation rates" as Trade Secret 36, and its generalized knowledge that the preceding two trade secrets have value and importance as Trade Secret 37.  *See* FAC ¶ 50.d.  ClickUp challenges these Customer Conversion Metrics Trade Secrets as insufficiently constrained because they are located in "some open-ended set" due to Nifty's use of the word "including" in its definitions of these trade secrets.  *See* Mem. at 9–10.  Nifty counters by distinguishing ClickUps's cited cases as analyzing alleged trade secrets much broader and more generalized than those asserted by Nifty. Opp'n at 17–18.  The Parties rely on these same arguments when it comes to the Customer Data Trade Secrets, which Nifty summarizes in the FAC as "customer information, including information concerning customer's specific needs and preferences."  FAC ¶ 50.e.

Nifty has the stronger of the arguments on this point.  The Ninth Circuit in *InteliClear* made clear that, at the pre-discovery stage, a plaintiff's "burden is only to identify at least one trade secret with sufficient particularity to create a triable issue." *InteliClear*, 978 F.3d at 659.  True, certain of ClickUp's cited cases could be interpreted as having rejected trade secret classifications that left the plaintiff's allegations open-ended and undefined due to the presence of the word "including."  *See, e.g.*, *Becton, Dickinson & Co. v. Cytek Biosciences Inc.*, No. 18-cv-00933-MMC, 2018 WL 2298500, at *3 n.6 (N.D. Cal. May 21, 2018) ("Further, the list of examples is preceded by the word 'include,' leaving the allegation ambiguous as to whether [the plaintiff's] claim is based on additional information."); *see also Loop AI Labs Inc. v. Gatti*, 195 F. Supp. 3d 1107, 1115 (N.D. Cal. 2016) (rejecting asserted trade secrets because they "contain[ed] 'catchall' wording such as 'including' when describing the trade secrets" (citing *Imax*, 152 F.3d at 1167)).  But to

the extent those district courts dismissed trade secret misappropriation claims because the allegations identified some, rather than all, of the asserted trade secrets, those cases are inconsistent with *InteliClear*, which was decided more recently and by a higher authority.

At any rate, in all of ClickUp's cited cases, "use of the word 'including' alone was never sufficient on its own for the court to find dismissal warranted." *Masimo Corp. v. Apple Inc.*, No. SACV 20-48 JVS (JDEx), 2020 WL 6653652, at *3 (C.D. Cal. Oct. 13, 2020). In *Becton*, for instance, the court rejected the asserted trade secrets because the plaintiff's allegations mentioned only the general categories of information that were misappropriated while failing to limit the allegations to a specific product. 2018 WL 2298500, at *3. Similarly, in *Loop AI Labs*, the court rejected the asserted trade secrets because the plaintiff merely "list[ed] general concepts or categories of information" without offering the defendant "a reasonably concrete definition of the purported secrets." 195 F. Supp. 3d at 1114–15. Unlike those cases, Nifty describes its Customer Conversion Metrics Trade Secrets and Customer Data Trade Secrets as discrete, particularized data points, putting ClickUp on clear notice of the outer bounds of its allegations. Such descriptions are sufficiently detailed such that ClickUp can "ascertain at least the boundaries within which the secret lies."[3] *Pellerin v. Honeywell Int'l, Inc.*, 877 F. Supp. 2d 983, 988 (S.D. Cal. 2012) (quoting *Diodes, Inc. v. Franzen*, 67 Cal. Rptr. 19, 24 (Ct. App. 1968)). Accordingly, Nifty's Customer Conversion Metrics Trade Secrets and Customer Data Trade Secrets are defined with sufficient particularity.

Still, a question does arise with respect to Trade Secret 36, which the Court construes as the sole secret in the crosshairs of ClickUp's argument that Nifty fails to identify its customer conversion rate "secret." *See* Mem. at 13–15. In the FAC, Nifty describes this secret as "how and why Nifty obtained its above-market customer conversion rates—i.e., converted a free user to a paying customer." FAC ¶ 50.d. In the corresponding paragraph

---

[3] In Reply, ClickUp perplexingly states that "trade secret no. 35 does not even identify a 'rate,'" Reply at 6 n.5, but paragraph 35 of Exhibit B very clearly states what "rate" Nifty is claiming as its trade secret.

36 of Exhibit B, Nifty alleges that the "how and why" behind the high customer conversion rate has something to do with its pricing landing page. ECF No. 34 ¶ 36. Nifty's position takes a strange detour in its Opposition, however, in arguing that the "how and why" is actually "the result of Nifty's proprietary process for analyzing and optimizing customer behavior over several years." Opp'n at 8. Nifty then goes on to describe that proprietary process—filed under seal—wherein the process has, by the Court's review, nothing at all to do with its pricing landing page. *Id.* Instead, Nifty argues its proprietary process involves a method for analyzing customer patterns and behavior in such a way as to optimize conversion rates and customer retention. *Id.* Nothing in the sealed portion of page 8 of Nifty's Opposition bears on the pricing landing page, thus shattering the Court's understanding of what Trade Secret 36 encompasses. Because the Court emerges from the Parties' briefing thoroughly puzzled by the contours of Trade Secret 36, that secret is not adequately pled.[4]  *See Creative Writer*, 2023 WL 6786796, at *4 (holding that a trade secret lacked sufficient particularity where the court was "not entirely sure" about what the trade secret was).

### 2.    Distinguishing Trade Secrets from Publicly Known Information

ClickUp raises a second argument, independent of the first, that Nifty fails to plausibly allege ownership of a protectable trade secret because Nifty fails to allege that its trade secrets are not "widely known" in the industry. Mem. at 12. This argument is directed specifically to Nifty's asserted Technical Architecture Trade Secrets, Real-Time Update Solution Trade Secrets, and Platform Optimization Techniques Trade Secrets. *Id.* at 11–12. In general, ClickUp contends that the FAC contains only conclusory language regarding the secrecy of those trade secrets such that Nifty's misappropriation claims must be dismissed.

---

[4] The Court reiterates the conclusion from its prior dismissal Order that, to the extent Nifty alleges publicly accessible features and characteristics of its pricing landing page are trade secrets, such an "argument is a non-starter." MTD Order at 16 (citing *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1011 (1984)).

This argument relies primarily on *Agency Solutions.Com v. TriZetto Group, Inc.*, but that case is easily distinguishable. *See* 819 F. Supp. 2d 1001 (E.D. Cal. 2011). There, key to the court's decision to reject several groups of alleged trade secrets was the plaintiff's failure to demonstrate why the information exchanged with the defendant "did not merely reflect facts that would be known to any other software company designing front-end software for the small business market or that [the information] would not be manifest in the operation of the finished program." *Id.* at 1020. Put differently, the court understood the alleged trade secrets to "prescribe a particular, and perhaps even proprietary, way of doing something that would (1) be done in a similar if not identical way by someone else in the same field *and* (2) would be evident to a person using the program for its intended purpose." *Id.* at 1021 (emphasis added) (citing *Silvaco Data Sys. v. Intel Corp.*, 109 Cal. Rptr. 3d 27 (Ct. App. 2010)). Whereas ClickUp primarily focuses on the first feature of the alleged trade secrets in *Agency Solutions.Com*, it declines to grapple with the second.

Yes, ClickUp touches on this second feature in asserting that "Nifty has failed to explain how these asserted 'trade secrets' did not merely reflect information that would be known to any other company in the productivity management industry, or manifest in the operation of the program." Mem. at 12. But saying as much does not make it so; rather, the FAC contains specific factual allegations plausibly showing that the back-end and front-end architecture asserted by Nifty as trade secrets are *not* known to others in the industry and do *not* manifest in the operation of the program. For example, in the section of the FAC describing the Technical Architecture Trade Secrets, Nifty alleges that "the code structure for Nifty's microservices . . . was maintained in code repositories, access to which was restricted." FAC ¶ 50.a. Nifty further alleges that the individuals "with access to those trade secrets were instructed to keep it confidential and were otherwise subject to obligations to keep the material secret." *Id.* And with respect to the Real-Time Update Solution Trade Secrets and Platform Optimization Techniques Trade Secrets, Nifty alleges that none of the trade secrets "manifested in the public facing aspects of Nifty's platform."

24-CV-194 JLS (AHG)

*Id.* ¶¶ 50.b.–50.c.  These allegations, thus, go beyond those in *Agency Solutions.Com*, where the court found that the information asserted as trade secrets would be "evident to any member of the public that uses the program."  819 F. Supp. 2d at 1021.

To be sure, the burden is on Nifty to establish that its asserted trade secrets are not "publicly available or widely known in a given industry."  *Prostar Wireless Grp., LLC v. Domino's Pizza, Inc.*, 360 F. Supp. 3d 994, 1013 (N.D. Cal. 2018) (citing *Walker v. Univ. Books, Inc.*, 602 F.2d 859, 865 (9th Cir. 1979)).  But making that determination often requires establishing a factual record from which to deduce whether the information is, in fact, publicly available or widely known.  *See Copart, Inc. v. Sparta Consulting, Inc.*, 277 F. Supp. 3d 1127, 1154 (E.D. Cal. 2017) (recognizing that "[w]hether information constitutes a trade secret is a fact-intensive determination" (citing *In re Providian Credit Card Cases*, 116 Cal. Rptr. 2d 833 (Ct. App. 2002))).  Here, at the pleading stage, Nifty has done enough to plausibly allege that the Technical Architecture Trade Secrets, Real-Time Update Solution Trade Secrets, and Platform Optimization Techniques Trade Secrets are secret.  *See Bos. Sci. Corp. v. Nevro Corp.*, No. 16-1163-CFC-CJB, 2020 WL 6261624, at *4 n.7 (D. Del. Oct. 19, 2020) (suggesting that inquiring into "whether plaintiff's asserted trade secrets were publicly available or widely known in a given industry" might be better suited for summary judgment (citing *Prostar*, 360 F. Supp. 3d at 1013)).

### B. Misappropriation

To plead misappropriation under the DTSA and CUTSA, the plaintiff must show "the '(1) [a]cquisition of a trade secret by another person who knows or has reason to know that the trade secret was acquired by improper means;' or the '(2) [d]isclosure or use of a trade secret of another without express or implied consent.'"  *Alta Devices*, 343 F. Supp. 3d at 882  (first citing  18 U.S.C. § 1839(5); and then citing Cal. Civ. Code § 3426.1(b)).  Though  "[a]llegations  of  similarity,  without  more,  do  not  support  a  claim  of misappropriation of trade secrets,"  *Brown v. Adidas Int'l*, 938 F. Supp. 628, 634 (S.D. Cal. 1996), "allegations of similarities . . . when accompanied by allegations of exactly how

defendants improperly obtained the alleged trade secrets" is sufficient, *Alta Devices*, 343 F. Supp. 3d at 883. The plaintiff "need not be clairvoyant and allege exactly how [the defendant] is improperly using its trade secrets," *Space Data Corp. v. X*, No. 16-cv-03260-BLF, 2017 WL 5013363, at *2 (N.D. Cal. Feb. 16, 2017), but it must do more than allege facts that are "merely consistent with" a theory of innocent behavior, *Veronica Foods Co. v. Ecklin*, No. 16-cv-07223-JCS, 2017 WL 2806706, at *14 (N.D. Cal. June 29, 2017) (first citing *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 997 (9th Cir. 2014); and then citing *In re Century Aluminum Co. Secs. Litig.*, 729 F.3d 1104, 1108 (9th Cir. 2013)).

ClickUp argues—specifically with respect to the Customer Data Trade Secrets (Trade Secrets 38–44)—that Nifty fails to plausibly allege misappropriation. Said trade secrets were allegedly shared with ClickUp pursuant to the NDA, but ClickUp contends that the FAC contains no allegations raising the plausible inference that the Customer Data Trade Secrets were improperly acquired, disclosed, or used. Mem. at 15.

In response, Nifty focuses on the "use" prong of misappropriation (as opposed to acquisition or disclosure) by highlighting modifications that ClickUp made to its pricing page. Nifty's theory of the claim goes something like this: Pursuant to the NDA, Nifty shared with ClickUp data that "includes lists of paid customers, lists of free customers, historical trends of daily and monthly users, and, critically, the sales and annual and monthly revenue rate broken down by those customers." Opp'n at 21 (internal quotation marks omitted). ClickUp, after obtaining these metrics as well as the knowledge that Nifty has obtained a high customer conversion rate, "changed the pathway to its pricing pages [by] . . . adopting a design that mirrored Nifty's approach by bringing previously hidden pricing details to the forefront." *Id.* at 22. In Nifty's view, by taking this action, ClickUp improperly used the Customer Data Trade Secrets that were exchanged under the NDA. *Id.*

The Court is not persuaded that it can plausibly draw Nifty's desired inference from these alleged facts. There is no dispute that Nifty's pricing landing page, which ClickUp

purportedly copied after receiving Nifty's customer information, was publicly available for all to see prior to the exchange of information under the NDA. *See* FAC ¶¶ 41, 55. Nifty insinuates that, because ClickUp changed its pricing page "within days" of reviewing Nifty's customer data under the NDA, the logical inference is that somewhere within the customer data was a kernel of insight prompting the change. *Id.* ¶ 55. Missing from the FAC, however, is any semblance of a relationship between the customer data and the location of ClickUp's pricing page. Nifty fails to show how ClickUp's decision to pull its pricing page out from behind a landing page link could have been a result of ClickUp misusing Nifty's customer data.

Unlike the quintessential case of customer information misappropriation recognized by the Ninth Circuit, where "information from a customer database is used to solicit customers," Nifty's allegations lack any nexus between the asserted trade secret and the action constituting misappropriation. *See MAI Sys. Corp. v. Peak Comput., Inc.*, 991 F.2d 511, 521 (9th Cir. 1993) (citing *Am. Credit Indem. Co. v. Sacks*, 262 Cal. Rptr. 92, 99–100 (Ct. App. 1989)). That principle permeates through even Nifty's own cited cases and is fatal to the misappropriation claim as it pertains to the Customer Data Trade Secrets. *See, e.g.*, *Gatan, Inc. v. Nion Co.*, No. 15-cv-01862-PJH, 2017 WL 1196819, at *6 (Mar. 31, 2017) (concluding that improper use "includes situations where the defendant built upon or modified the trade secret" (internal quotation marks and citation omitted)); *Autodesk, Inc. v. ZWCAD Software Co.*, No. 5:14-cv-01409-EJD, 2015 WL 2265479, at *1 (May 13, 2015) (finding plausible allegations of misappropriation where the defendant "engaged in wholesale copying of large portions of [the plaintiff's] source code in order to create its software program," which "display[ed] identical idiosyncrasies and bugs that could have been introduced only through the wholesale copying of significant portions of" the stolen code (internal quotation marks omitted)). Simply put, that ClickUp changed its pricing page to mirror that of Nifty's bears little relevance, if any at all, to the question of whether ClickUp used Nifty's customer

///

information in a way that exceeded Nifty's express or implied consent.  *See Alta Devices*, 343 F. Supp. 3d at 877.

Before proceeding, the Court briefly pauses to address footnote four of Nifty's Opposition, in which Nifty asserts that the "Court already found Nifty sufficiently alleged misappropriation by misuse."  Opp'n at 21 n.4 (citing MTD Order at 22–23).  Ostensibly, Nifty is under the impression that the Court's analysis of improper use as alleged in the original Complaint should control the analysis of improper use as alleged in the FAC.  But that understanding is not quite right.  The Court's prior analysis considered a Complaint with different factual allegations than those presented in the FAC, many of which are no longer present.  For instance, in its Complaint, Nifty touted its "'revolutionary' document-tagging feature," ECF No. 1 ¶ 50, but that feature is mentioned nowhere in the FAC.  Thus, the Court's prior comments on Nifty's allegations related to improper use of the document-tagging feature have no applicability to the instant Motion.  Similarly, the Court's prior analysis assumed arguendo (after deciding otherwise) that Nifty had plausibly alleged the existence of a trade secret pertaining to its pricing page, but Nifty expressly disclaims such a trade secret in its Opposition.  *See* Opp'n at 21 ("ClickUp suggests Nifty is claiming its pricing page is the trade secret.  It is not.").  "[I]t is well-established that an amended pleading supersedes the original pleading and renders it of no legal effect," so the factual basis of Nifty's claims is now tied to the FAC rather than the Complaint.  *See Williams v. County of Alameda*, 26 F. Supp. 3d 925, 936 (N.D. Cal. 2014).  While dicta in the Court's original dismissal Order was intended to guide the course of this suit's pleading stage, the Parties should be cautious in relying on statements by the Court that are inapposite to the factual allegations presently at issue.

### C.    *Trade Secret Misappropriation Summary*

In sum, the Court resolves Nifty's trade secret misappropriation claims (Claims 1 and 2) as follows.  Nifty fails to identify Trade Secrets 1, 16, and 36 (and Trade Secrets 15, 21, and 37, to the extent they rely on Trade Secrets 1, 16, and 36, respectively) with the requisite specificity to survive dismissal.    And Nifty fails to plausibly allege

misappropriation of the Customer Data Trade Secrets (Trade Secrets 38–44). Accordingly, consistent with this summary, ClickUp's Motion is **GRANTED IN PART** and **DENIED IN PART**. *See Citcon USA, LLC v. RiverPay Inc.*, 2018 WL 6813211, at *7 (N.D. Cal. Dec. 27, 2018) (dismissing trade secret misappropriation claims only as to some of the asserted trade secrets while sustaining the trade secret misappropriation claims as to others), *rev'd on other grounds*, No. 20-16929, 2022 WL 287563 (9th Cir. Jan. 31, 2022).

## II.    Unfair Competition Law ("UCL") Claim

The Court finally turns to ClickUp's arguments that Nifty's UCL claim should be dismissed. Section 17200 of the California Business and Professions Code "broadly proscribes 'unfair competition,' including 'any unlawful, unfair or fraudulent business act or practice.'" *Waymo LLC v. Uber Techs., Inc.*, 256 F. Supp. 3d 1059, 1062 (N.D. Cal. 2017) (quoting *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 973 P.2d 527, 539 (Cal. 1999)). Nifty accuses ClickUp of violating this broad proscription by "misrepresenting Nifty's product through false blog posts." FAC ¶ 71. On Nifty's version of events, current and potential Nifty customers exposed to the false posts opted to use ClickUp's product instead of Nifty's. *Id.* ¶ 72. Nifty, on that basis, asserts a single UCL claim under the fraudulent and unfair prongs of the UCL, both of which ClickUp maintains should be dismissed for lack of statutory standing and the latter of which ClickUp argues should be dismissed for failure to state a claim. Mem. at 16–19.[5]

The UCL protects against three distinct business practices—those "that are (1) unlawful, (2) unfair, or (3) fraudulent." *Backhaut v. Apple, Inc.*, 74 F. Supp. 3d 1033, 1050 (N.D. Cal. 2014) (citing Cal. Bus. & Prof. Code § 17200). "Each of these prongs 'is a separate and distinct basis for liability,'" *Snapkeys, Ltd. v. Google LLC*, No. 19-CV-02658, 2020 WL 6381354, at *3 (N.D. Cal. Oct. 30, 2020) (quoting *Lozano v.*

---

[5] ClickUp additionally argues that Nifty fails to state a claim under the unlawful prong of the UCL, Mem. at 18, but Nifty confirms in its Opposition that it "is not bringing its UCL claim under the unlawful prong," Opp'n at 22 n.5.

*AT&T Wireless Servs., Inc.*, 504 F.3d 718, 731 (9th Cir. 2007)), with California courts having set forth different standards depending upon which theory the plaintiff embraces.

Under any prong, however, the UCL requires a showing that the plaintiff "has suffered injury in fact and has lost money or property *as a result of* the unfair competition." Cal. Bus. & Prof. Code § 17204 (emphasis added). This "as a result of" language was added to the UCL in 2004 in an effort to curb abuses of private enforcement actions that had previously been available to "any person acting for the general public . . . ." *Californians for Disability Rts. v. Mervyn's, LLC*, 138 P.3d 207, 209 (Cal. 2006). Following the 2004 amendment, standing under the UCL was "confine[d] . . . to those actually injured by a defendant's business practices . . . ." *Kwikset Corp. v. Superior Ct.*, 246 P.3d 877, 884 (Cal. 2011). For the last two decades, courts have struggled to interpret the scope of the amendment's impact on the statutory standing requirement, particularly when it comes to fraud-based UCL claims.

As to the *substance* of a fraud-based claim, the "fraudulent business practice prong of the UCL has been understood to be distinct from common law fraud" to "reflect[] the UCL's focus on the defendant's conduct, rather than the plaintiff's damages." *In re Tobacco II Cases*, 207 P.3d 20, 29–30 (Cal. 2009) ("*Tobacco II*"); *see also Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1068 (9th Cir. 2014) (first citing *Tobacco II*, 207 P.3d at 29–30; and then citing *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1020–21 (9th Cir. 2011)), *abrogated on other grounds by*, *Microsoft Corp. v. Baker*, 582 U.S. 23 (2017). But as to the necessary *standing* requirement to assert a fraud-based claim under the UCL, the California Supreme Court has espoused "well-settled principles regarding the element of reliance in ordinary fraud actions" to impose an "actual reliance" standard for a plaintiff "proceeding on a claim of misrepresentation as the basis of his or her UCL action . . . ." *Id.* at 26. California courts have extended the "actual reliance" requirement to UCL claims brought under the other two prongs when the nature of the claim is based upon misrepresentation or consumer deception. *See, e.g.*, *Durell v. Sharp Healthcare*, 108 Cal. Rptr. 3d 682, 694 (Ct. App. 2010) (reasoning that a plaintiff's "burden of pleading

causation in a UCL action should hinge on the nature of the alleged wrongdoing rather than the specific prong of the UCL the consumer invokes").

As this Court held in its prior dismissal Order, Nifty's UCL claim is based on purportedly false statements in online blog posts, which "is fundamentally 'a fraud theory involving false advertising and misrepresentation to consumers." MTD Order at 27 (quoting *Tobacco II* at 39). Thus, Nifty must allege "actual reliance" because its UCL claim "sounds in fraud." *See Hale v. Sharp Healthcare*, 108 Cal. Rptr. 3d 669, 679 (Ct. App. 2010). But the Court also recognized in its prior dismissal Order that there is a split in authority as to whether a competitor-plaintiff, like Nifty, must plead its own reliance or whether a competitor-plaintiff can merely plead consumer reliance. MTD Order at 28. The Court had no occasion to weigh in on the schism during the last go-around because Nifty's UCL claim failed either way. *Id.* (concluding that Nifty failed to plausibly allege actual reliance by anyone, even a consumer). This time, however, the Court must pick a side because Nifty now plausibly alleges that consumers did indeed change their behavior as a direct result of the purportedly false blog posts. *See* FAC ¶ 44.

The Parties unsurprisingly cite to cases supporting their respective positions, but they do not otherwise forcefully advocate for why either position is correct. ClickUp just notes that the "weight of authority holds that a competitor plaintiff 'must be able to allege its own reliance rather than the reliance of third parties.'" Mem. at 16 (first quoting *A White & Yellow Cab, Inc. v. Uber Techs., Inc.*, No. 15-cv-05163-JSW, 2017 WL 1208384, at *8 (N.D. Cal. Mar. 31, 2017); and then citing *Zest Anchors, LLC v. Geryon Ventures, LLC*, No. 22-CV-230 TWR (NLS), 2023 WL 2903668, at *7 n.3 (S.D. Cal. Apr. 10, 2023)). Meanwhile, Nifty simply cites to a few of the California district courts that have held "that competitor-plaintiffs can establish standing under the UCL by alleging consumer reliance alone." Opp'n at 23 (first citing *Sciclex Pharms. Inc. v. Sanofi-Aventis U.S. LLC*, No. 21-cv-01280-JST, 2021 WL 11593043, at *7 (N.D. Cal. Aug. 16, 2021); then citing *Allergan USA Inc. v. Imprimis Pharms., Inc.*, No. SA CV 17-1551-DOC (JDEx), 2017 WL 10526121, at *13 (C.D. Cal. Nov. 14, 2017); and then citing *Jerome's Furniture*

*Warehouse v. Ashley Furniture Indus., Inc.*, No. 20CV1765-GPC(BGS), 2021 WL 1541649, at *8 (S.D. Cal. Apr. 20, 2021)).  In the absence of controlling authority from a California court, the Court must determine for its own which position is more persuasive.

Having reviewed the pertinent case law, the Court sides with ClickUp and the majority of courts to have considered the question.  In justifying its imposition of the "actual reliance" standing requirement for fraud-based UCL claims in *Tobacco II*, the California Supreme Court emphasized common-law fraud principles.  *See Tobacco II*, 207 P.3d at 309.  For example, the court led off its discussion of reliance by citing to the 1993 case of *Mirkin v. Wasserman*, 858 P.2d 568 (Cal. 1993), *id.*, which goes into an extensive discussion of how the common law of deceit requires the plaintiff to, him or herself, rely on the misrepresentation, *Mirkin*, 858 P.2d at 570.  The *Tobacco II* court then moved on to discuss various features of the "actual reliance" doctrine, each of which is premised upon the plaintiff's own reliance on the alleged misrepresentation.  *See Tobacco II*, 207 P.3d at 39 (citing *Engalla v. Permanente Med. Grp., Inc.*, 938 P.2d 903 (Cal. 1997), for the proposition that the fraudulent misrepresentation need only play a substantial part in *the plaintiff's* injury-producing conduct); *see also id.* at 40 (citing *Boeken v. Philip Morris, Inc.*, 26 Cal. Rptr. 3d 638 (Ct. App. 2005), and *Whiteley v. Philip Morris, Inc.*, 11 Cal. Rptr. 3d 807 (Ct. App. 2004), for the proposition that *the plaintiff's* injury-producing conduct need not be demonstrated on the basis of "individualized reliance on specific misrepresentations").  Two years later, the California Supreme Court in *Kwikset* doubled down and similarly explained that the "actual reliance" standing requirement finds its genesis in "the ordinary fraud context."  *Kwikset*, 246 P.3d at n.10 ("It follows that a UCL fraud plaintiff must allege he or she was motivated to act or refrain from action based on the truth or falsity of a defendant's statement, not merely on the fact it was made." (citing *Buckland v. Threshold Enters., Ltd.*, 66 Cal. Rptr. 3d 543 (Ct. App. 2007))).  Thus, like the other courts to have landed on the majority rule, the Court finds the "explanation[s]

/ / /

of the reliance requirement" in *Tobacco II* and *Kwikset* uniquely instructive. *See A White and Yellow Cab*, 2017 WL 1208384, at *9.

Make no mistake; the Court appreciates the well-reasoned and compelling opinions that distinguish a competitor-plaintiff case, like this one, from the consumer-plaintiff cases like *Tobacco II* and *Kwikset*. *See, e.g.*, *Allergan*, 2017 WL 10526121, at *13–14. And the California Supreme Court certainly gave mixed signals in those two seminal cases as to whether a competitor-plaintiff can depend solely on consumer reliance, such as by emphasizing that the UCL's purpose is to serve both consumers and competitors alike. *See Kwikset*, 246 P.3d at 883 ("Its purpose 'is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services." (internal quotation marks and citations omitted)). But at the end of the day, the Court circles back to the introductory paragraphs of *Tobacco II*, where that court stated in no uncertain terms that a plaintiff "proceeding on a claim of misrepresentation as the basis of his or her UCL action must demonstrate actual reliance . . . in accordance with well-settled principles regarding the element of reliance in ordinary fraud actions." 207 P.3d at 26. Because those well-settled principles counsel against authorizing third-party reliance to serve as the basis for a fraud-based UCL claim, the Court concludes that California law requires a competitor-plaintiff to allege its own reliance. *See L.A. Taxi Coop., Inc. v. Uber Techs., Inc.*, 114 F. Supp. 3d 852, 867 (N.D. Cal. 2015) ("Furthermore, in general, outside the context of the UCL, "a fraud action cannot be maintained based on a third party's reliance." (quoting *City and Cnty. of S.F. v. Philip Morris, Inc.*, 957 F. Supp. 1130 (N.D. Cal. 1997))).

Applying the "actual reliance" standard here is straightforward. Nifty alleges no facts that plausibly show its own reliance on the purported false blog posts serving as the basis of the UCL claim. Instead, Nifty relies exclusively on the theory that consumers relied on the false representations. *See* FAC ¶¶ 44, 72. Because it fails to allege its own reliance on the blog posts, Nifty fails to state a claim under either the unfair or fraudulent prong of the UCL. Accordingly, Claim III is **DISMISSED**. The Court need not reach

ClickUp's alternative argument that the UCL claims fails on the merits under the unfair prong.

## CONCLUSION

In light of the foregoing, the Court **GRANTS IN PART** and **DENIES IN PART** Defendant's Motion to Dismiss (ECF No. 37). Consistent with this Order, Claims I–II are **DISMISSED IN PART**, and Claim III is **DISMISSED**. Dismissal of Claims I–III is **WITHOUT PREJUDICE**.

As the Court cannot definitively conclude doing so would be futile, the Court will provide Nifty the opportunity to amend. *See Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000). <u>Within twenty-one (21) days</u> of this Order, Nifty either **(1) SHALL FILE** an amended complaint, or **(2) SHALL INDICATE** to the Court that it will not do so. *Failure to timely select either of the above options may result in the dismissal of Claims I–III pursuant to Federal Rule of Civil Procedure 41(b)*. *See Applied Underwriters, Inc. v. Lichtenegger*, 913 F.3d 884, 890–91 (9th Cir. 2019) (explaining that courts may dismiss an action under Rule 41(b) when a plaintiff fails to comply with a court order requiring the filing of an amended complaint). Any amended complaint must be complete in and of itself without reference to Nifty's FAC; claims not realleged in the amended complaint will be considered waived. *See* S.D. Cal. CivLR 15.1; *Lacey v. Maricopa County*, 693 F.3d 896, 928 (9th Cir. 2012) (noting claims dismissed with leave to amend that are not realleged in an amended pleading may be "considered waived").

**IT IS SO ORDERED.**

Dated: July 1, 2025

*Janis L. Sammartino*
Hon. Janis L. Sammartino
United States District Judge